604 So.2d 71 (1992)
STATE of Louisiana, Plaintiff-Appellee,
v.
Nathan Howard PONTIFF, Defendant-Appellant.
Cr91-720.
Court of Appeal of Louisiana, Third Circuit.
June 17, 1992.
*72 Edward J. Marquet, Lafayette, for defendant-appellant.
Mike Harson, Asst. Dist. Atty., Lafayette, for plaintiff-appellee.
Before DOUCET and KNOLL, JJ., and COREIL,[*] J. Pro Tem.
KNOLL, Judge.
Defendant, Nathan Howard Pontiff, appeals his conviction of forcible rape,[1] a violation of LSA-R.S. 14:42.1, and his sentence of 10 years at hard labor, 2 years to be served without benefit of parole, probation or suspension of sentence. Defendant assigns as errors insufficient evidence to support the conviction and alternatively, the imposition of an excessive sentence. We affirm.

FACTS
On Saturday evening October 7, 1989, at approximately 8:00 p.m., defendant, along with his friends, Jerry, Eric and Eddie, arrived at Jane Doe's[2] home in Lafayette and sounded the horn for her and her friend, Heather, to come out. Jane Doe and Heather were trainers on a local high school football team. Before Jane Doe left, her father and stepmother wanted to meet the defendant and Eric. Eric was Heather's boyfriend. At this time, Jane and defendant were 15 years of age, Heather was 16, and Eric, Jerry and Eddie *73 were 17. Defendant and Eric went inside, introduced themselves and told Jane's father and stepmother that they were going to Colors, a local teenage club in Lafayette. After introduction, Jane and Heather left with defendant, Eric, Jerry, and Eddie. Jane had never socialized with defendant, Eric or Jerry, but had seen them around school. She had never met or seen Eddie.
Before going to Colors, the group drove around. Then, they pooled their money and purchased beer and whiskey at a local convenience store. All but Eddie, the driver, drank that evening.
The group then went to Eric's house for the apparent purpose of allowing Heather and Eric to remain at his house in order to engage in sexual intercourse. After Eric and Heather were dropped off, the defendant, Jerry, Eddie and Jane rode around for awhile and eventually proceeded to the house of a friend, Andre, which was unoccupied and being remodeled. Eddie dropped off defendant, Jerry and Jane at Andre's house and left to buy some marijuana.
Jane testified that she, Jerry and defendant remained on the front porch of Andre's house for approximately five minutes. She heard Jerry say something to the effect that there were two boys and only one girl, and rhetorically asked what could they do. After telling Jane that they were going to knock on Andre's window, the defendant and Jerry walked to the rear of the house. Hearing glass break, Jane walked to the fence which enclosed the backyard, and Jerry opened the gate. The two walked through the backyard and underneath a tin roof extending from the rear of the house. Jerry made a lewd suggestion about her having oral sex with him and grabbed her wrists as defendant tried to pull down her shorts. She pulled away to leave, but stopped when defendant commented about the presence of snakes in the backyard. From behind, defendant then pulled down Jane's shorts as Jerry grabbed and held her wrists at her side. She testified that Jerry said to defendant, "Get the back and I'll get the front". Defendant sat down on an overturned five gallon bucket with his pants unzipped and his penis exposed. From the front, Jerry forced Jane to "sit down" on defendant. While holding Jane, Jerry attempted to make her perform oral sex as defendant penetrated her vagina. Jane testified that after approximately 30 minutes, Jerry allowed her to stand and defendant walked to the side of the house and ejaculated. Hearing Eddie drive up in the front driveway, defendant ran to the front of the house. Still struggling with Jerry, Jane reportedly fell against a wall and then onto the ground. After pulling up her shorts, she made her way to the front yard and asked Eddie to take her home. Jane, defendant and Jerry got into the car and left. Eddie agreed to take her home after first picking up Eric and Heather, and passing by Colors.
Arriving at Eric's house, defendant bragged to Heather in crude slang terms that he had just had sexual intercourse with Jane and she also had oral sex with Jerry. When Heather confronted her about the episode, Jane denied it and lowered her head.
The group left Eric's house and proceeded to an area of Lafayette known as Chester Street where teenagers often congregate. Riding on Chester Street, both defendant and Jerry shouted to several friends in front of Jane, using very crude and dirty slang terms, what transpired and that they paid her $10. Again, Jane lowered her head and remained quiet.
When they arrived at Colors, Jane bolted from the car, walked across the street to a convenience store and telephoned home. While waiting for her father, Jane spoke with two policemen, but apparently did not mention the rape. Her father arrived shortly after Heather walked over to find out what was wrong. Arriving home, Jane began crying and, according to her father, appeared disoriented.
Officer Ronald Robicheaux of the Lafayette Parish Sheriff's Office arrived at Jane's home near midnight. He described her as upset and crying and, after calming her, she told him that defendant and Jerry were the perpetrators. Officer Robicheaux testified that he saw no bruises on Jane's *74 face. He then collected the clothing Jane wore that night and transported her to a local hospital for medical examination.
Dr. Donald E. Michael, an obstetrician and gynecologist who was the emergency room physician that night, performed a complete medical examination on Jane, including what is commonly known as a "rape kit". Dr. Michael found no evidence of any trauma either in the pelvic region or the rectal area. Bruises on Jane's inner left thigh and left calf muscle were ruled out from occurring that night since Jane told Dr. Michael that the bruises were approximately one week old. Dr. Michael testified that his examination was inconclusive regarding whether Jane had engaged in sexual intercourse in the last five to six hours. Dr. Michael also acknowledged that while bruises generally appear within hours of a trauma, he could not rule out the possibility of the bruises taking longer to appear on Jane.
Juvenile Detective Thomas Stith of the Lafayette Parish Sheriff's Office testified that on October 8, the day after the attack, he saw no bruises on Jane; nevertheless, he also told the jury that Jane complained of pain in both wrists and admitted that since he performed only a cursory inspection of her arms, he could have missed the bruises. He likewise observed no physical marks of struggle such as bruises or scratches on defendant or Jerry, and he did not arrest defendant. The following day, Detective Stith spoke with Jane and, again observed no bruises. Several days later, Jane's father gave Detective Stith photographs taken by him on October 10 which depicted bruises on Jane's arms and shoulder.
Kenneth R. Bouillion, a child psychologist, began treating Jane four days after the rape for psychological problems which surfaced as a result of defendant's sexual assault. Dr. Bouillion counselled Jane in eight sessions. He described her as open and credible in their sessions and opined that she exhibited a pattern of behavior consistent with someone who had been raped. Dr. Bouillion pointed out that often the first response of a rape victim is shock from the traumatic experience and not an easily identifiable outward emotional sign.
Heather testified that Jane flirted with defendant during the evening they were together. She also stated that after she confronted Jane about the sexual intercourse and oral sex, Jane denied it and asked to go home; thereafter Jane remained quiet. Jane testified that she denied having sexual intercourse to Heather because she did not equate the attack with sexual intercourse. Heather also stated that Jane approached her on two occasions and attempted to convince her to testify in support of her version of the facts and to not say anything about the origin of the bruises she received from her father.
Eddie, the driver, testified that after he dropped defendant, Jane and Jerry at Andre's, he was gone for only about five minutes. He stated that upon arrival, defendant ran to the front driveway and announced that he had sexual intercourse with Jane and then, Jerry told him about the oral sex. Eddie described Jane's behavior as normal with no dirt on her clothing or marks on her skin. He also explained that the morning after the alleged attack, Jane's father approached him as a police officer, and requested to see the alleged rape scene, Jerry's house, defendant's house, and his house.
At trial, defendant offered into evidence the taped statement of Jerry given to Detective Stith the morning after the attack. Jerry did not testify at trial. In his voluntary statement, Jerry stated that at Andre's house, he began playing with Jane's "rear" and asked if she wanted to have sexual intercourse. She reportedly answered affirmatively and expressed a desire to have sexual intercourse with both Jerry and defendant. Jerry refused and then suggested oral sex. Initially, Jane said no but then unzipped Jerry's pants and had oral sex only for a few seconds. Jerry zipped his pants and walked to the fence as defendant walked to Jane. After smoking a cigarette, Jerry returned to the area underneath the tin roof to find defendant seated on an overturned bucket with Jane "sitting on his lap". After instructing Jane *75 to stand, defendant stood up and ejaculated. Shortly after defendant pulled up his pants, Eddie returned. In his voluntary statement, Jerry described Jane as a "more than willing participant" in having sexual intercourse with defendant.
In defendant's voluntary statement to Detective Stith and at trial, defendant acknowledged having sexual intercourse with Jane but denied any coercion. He remembered her as being especially friendly toward him by placing her hand on his shoulder and speaking to him in a "sweet little voice". After Eddie left, Jerry and Jane began kissing in the backyard. Then, she reportedly told the two that she wanted to have sexual intercourse with both of them. Defendant walked to the overturned bucket, unzipped his pants and sat down. She lowered her shorts and underwear, and then "sat down" on defendant. Defendant stated that she helped him penetrate her and then she "rode" him. Then, defendant told her to stand and he ejaculated. About that time, Eddie returned to the front driveway of the house. Defendant and Jerry bragged to Eddie about what had just occurred. During the sexual encounter that lasted only a few seconds, defendant claims that Jerry was standing there watching and was not by the fence.

SUFFICIENCY OF THE EVIDENCE
Defendant contends that the State failed to prove each element of the crime of forcible rape beyond a reasonable doubt.
LSA-R.S. 14:42.1 defines forcible rape as:
"Forcible rape is a rape committed where the anal or vaginal sexual intercourse is deemed to be without the lawful consent of the victim because the victim is prevented from resisting the act by force or threats of physical violence under circumstances where the victim reasonably believes that such resistance would not prevent the rape."
When the issue of sufficiency of evidence is raised on appeal, the critical inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). It is the province of the jury and not that of the appellate court to assess the credibility of witnesses. The appellate court cannot re-evaluate credibility of witnesses and then proceed to overturn a factual determination of guilt. State v. Reaves, 569 So.2d 650 (La. App. 2nd Cir.1990), writ denied, 576 So.2d 25 (La.1991). Where a trier of fact has made a rational credibility determination, an appellate court cannot disturb it on review. State v. Mussall, 523 So.2d 1305 (La.1988).
The lack of medical evidence of rape is not dispositive of the question of sufficiency of the evidence since any sexual penetration, however slight, may constitute rape. State v. Peters, 441 So.2d 403 (La. App. 4th Cir.1983), writ denied, 530 So.2d 560 (La.1988).
Jane testified that Jerry grabbed her wrists and defendant pulled her shorts down past her knees and she started trying to pull away from them. She stated that defendant unzipped his pants, pulled out his penis, and sat down on a bucket while Jerry held her wrists with her arms down by her side. Defendant was seated behind her and Jerry was in front of her trying to kiss her and bite her ear. After Jane attempted several times to pull up her pants, Jerry pushed her down on defendant's lap. Jane stated that defendant's penis penetrated her vagina while he had one arm around her waist and one hand on his penis. She also stated that she could not stop defendant and Jerry, and that she did not want to have sexual intercourse with defendant.
Dr. Bouillion testified that Jane was competent to describe what happened to her. He also testified that Jane was also very credible since there was consistency in the way she appeared during her eight sessions with him, and that he observed nothing to contradict that she had been raped. Moreover, Dr. Bouillion opined that Jane showed a pattern of behavior and emotional adjustment *76 similar to the cycle that other rape victims experience.
Defendant testified that Jane voluntarily pulled down her gym shorts and panties, positioned herself with her back to his chest, and had sexual intercourse with him as he sat on a bucket. The defense also presented a taped statement by Jerry who was present during the rape. Jerry's statement corroborated defendant's assertion that Jane voluntarily engaged in sexual intercourse with him. In addition, defendant relies on the absence of bruises on Jane immediately after the attack, Jane's denial of sexual intercourse at Eric's house when confronted by Heather, Heather's testimony that Jane approached her on two occasions before trial and requested that she not divulge the true origin of her bruises, and the absence of any abnormal appearance or behavior by Jane immediately following the attack.
This case clearly presents a classic divergence of testimony. The victim characterized defendant's actions as an act of rape, and the defendant maintained that the victim consented to sexual intercourse. Thus, the determination of the sufficiency of the evidence hinges upon witness credibility. It is well established in our jurisprudence that the fact finder may accept or reject, in whole or part, the testimony of any witness. State v. Nolan, 503 So.2d 1186 (La. App. 3rd Cir.1987), writ denied, 507 So.2d 226 (La.1987).
The jury, sitting as the trier of fact, had the distinct opportunity to view each individual witness's demeanor, listen to their respective testimony, and assess credibility. Their firsthand knowledge of the witnesses's testimony is an immeasurable advantage when compared to our limited review within the four corners of the cold record. In the case sub judice, the jury chose to believe the testimony of the victim along with the testimony of Dr. Bouillion over defendant's denials. Since the record fully supports the jury findings, this court will not engage in reevaluating the credibility of witnesses and reweighing the other evidence adduced at trial.
Accordingly, viewing the record evidence under the Jackson standard, we find that a rational trier of fact could have found that the State proved the essential elements of forcible rape beyond a reasonable doubt. Therefore we find no merit to defendant's contrary contention.

EXCESSIVENESS OF SENTENCE
Defendant contends that the sentencing court imposed an excessive sentence.
Article 1, section 20 of the Louisiana Constitution prohibits "cruel, excessive, or unusual punishment." A sentence which falls within the statutory limits may nevertheless be excessive under the circumstances. State v. Naquin, 527 So.2d 601 (La.App. 3rd Cir.1988). To classify a sentence as excessive this court must either find that the penalty is so grossly disproportionate to the severity of the crime as to shock our sense of justice or that the sentence makes no measurable contribution to acceptable penal goals and therefore constitutes nothing more than the needless imposition of pain and suffering. State v. Campbell, 404 So.2d 1205 (La.1981). The sentencing court is given wide discretion in imposing a sentence, and a sentence imposed within the statutory limits will not be deemed excessive in the absence of manifest abuse of discretion. State v. Howard, 414 So.2d 1210 (La.1982).
LSA-C.Cr.P. Art. 894.1 requires the sentencing court to consider statutory guidelines of aggravating and mitigating factors in deciding on an appropriate sentence. The sentencing court need not articulate every circumstance or read through a checklist of items to comply with the requirements of Art. 894.1. State v. Davis, 448 So.2d 645 (La.1984).
The statutory sentencing range for forcible rape is imprisonment at hard labor for not less than 5 years nor more than 40 years, with imposition of at least two years of the sentence without benefit of parole, probation, or suspension of sentence.
In sentencing defendant to 10 years at hard labor with the first 2 years without benefit of parole, probation, or suspension of sentence, the sentencing court observed:

*77 "The Court has considered all the things that have been presented today, also the trial. And I understand the defendant's position still is that he's not guilty of the offense. The Court feels that the jury was correct. The jury was faced with the charge of aggravated rape and heard the evidence and came back with the responsive verdict of guilty of forcible rape.
The sentencing guidelines that the Court has to follow, the Court ishas considered all of them. But the two (2) that the Court feels are controlling is 14:894.1 [sic], Number 2 and 3, and that the defendant is in need of correctional treatment or custodial environment; and 3, the seriousness of the crime, and a lesser sentence would deprecate the seriousness of the crime.
Forcible rape is a very, very serious offense. And as I told [defense counsel] previously at pre-trial, the Court had considered sentencing the defendant for twenty (20) years at hard labor.
After considering all of the factors, including those that he [defendant] has no prior record and that he has not committed any other offense or gotten in any other trouble since he is on ... [bond], the Court will sentence the defendant to serve ten (10) years at hard labor with the Department of Corrections. Of the ten (10) years, two (2) are to be served without probation, parole, or suspension of sentence."
The sentencing court's reasons reflect that it complied with LSA-C.Cr.P. Art. 894.1. Additionally, in reviewing the record, we conclude that the sentence imposed on defendant is not constitutionally excessive in view of the severity of the offense and defendant's exposure to a potential sentence of 40 years at hard labor.

DECREE
For the foregoing reasons, defendant's conviction and sentence are affirmed.
AFFIRMED.
NOTES
[*] Judge Joseph E. Coreil, Retired, participated in this decision by appointment of the Louisiana Supreme Court as Judge Pro Tempore.
[1] Defendant, a juvenile, was originally indicted for aggravated rape. The jury, by a 10-2 verdict, returned the lesser included verdict, forcible rape.
[2] For the purpose of anonymity, the rape victim will be referred to as Jane Doe.