liKNOLL, Judge.
This appeal arises out of the conviction of the defendant, Charles “Chuekie” Matthews, for forcible rape in violation of LSA-R.S. 14:42.1. The trial court sentenced defendant to 40 years at hard labor, 10 years to be served without benefit of parole, probation, or suspension of sentence. Defendant appeals, contending the evidence is not sufficient to support his conviction and that his sentence is excessive.
FACTS
On Friday night, December 18, 1992, the victim, Y.O., attended a party in Lafayette at an apartment rented by the mother of another teenage girl. No parents were in the apartment at the time of the party. Y.O., who was 14 years of age at the time, went to the party with a high school friend, Crystal Meaux. At the party, Y.O. met several-other Lafayette high school students, including Dustin LeBleu. Y.O. knew most of these students, who were 14 or 15 years of age, from the high school. Witnesses estimated there were between 20 and 30 people at the party. While most of these were high school students, there were a few who were 19 or 20 years of age. Teenagers were coming and hgoing from the party and Y.O. left and returned to the party on two different occasions. During one of these occasions, Y.O. went with Dustin and two other teenagers to Dustin’s home where they remained an hour or two. On Y.O.’s return to the party for the second time, around 12:00 midnight or 1:00 a.m., the defendant was there. Defendant was 17 years of age at that time. Y.O. stated that she had drunk several shots of tequila earlier in the evening and had been feeling “tipsy,” but the effect had worn off by the time of the rape. At some point between 1:00 and 2:00 a.m., Y.O. went with Dustin into one of the bedrooms. Soon afterwards, the defendant followed them into the bedroom. While another teenager, Beth Ivy, was in the room, she was in a deep, tequila induced sleep, and did not remember any of the relevant events. Since the defendant did not take the stand, Dustin and Y.O. were the only witnesses who testified concerning the actual incident. Their testimony was largely contradictory.
Y.O. stated she and Dustin were talking on the bed when the defendant entered the room. Y.O. testified defendant closed the door and attempted to lock it. Defendant began asking Y.O. if she had ever “slept with two guys back to back” and tried to assure *856 her that her reputation would not be impugned. At this point, Y.O. remembered one of the older boys, Quincey, coming into the room, taking the mattress off the bed and moving it to another room. Beth, who was passed out on the bed, was put on the floor, and Y.O. and Dustin sat on the box springs. After Quincey left, defendant again closed the door and this time blocked it with a footloeker. Defendant then continued trying to convince Y.O. to have sex with both him and Dustin. She testified that she told defendant that she would have to think about it. Y.O. stated that she originally thought Dustin would protect her from defendant, but then became frightened. Defendant began taking off her pants and Dustin started unbuttoning her blouse. Y.O. stated she pleaded with them to stop, but they continued to undress her. While Dustin was holding her shoulders and kissing her, the defendant removed his pants and began having sexual intercourse with her. She testified she attempted to push defendant away, but to no avail. She testified defendant kept saying, “Say you love me. Say you like Dustin. Say you like this.” Y.O., afraid not to, began repeating his words. After defendant finished having intercourse with Y.O., she ^remembered defendant telling her not to tell anyone of the incident, explaining that “I don’t kill people, but I hire people to do my work.” Defendant then indicated she should have sex with Dustin and left the room. Y.O. then stated Dustin replaced the footloeker against the door and despite her pleading with him not to, Dustin forced Y.O. to have sexual intercourse with him. After this, both Dustin and Y.O. returned to the living room where the party was apparently winding down. Teenagers were sleeping on sofas, recliners, and etc. Y.O., defendant, and Dustin did the same until around 6:30 that morning. At this time Y.O., Crystal, Dustin, defendant, and two other teenagers left the apartment. After dropping the defendant and Dustin off at their homes, they went to Crystal’s house. After arriving at Crystal’s, she explained to Crystal what happened. Crystal advised Y.O. that they should tell other people, but Y.O. did not tell anyone else until the next morning, on Sunday. When Y.O. told her family on Sunday morning, the police were called and Y.O. was taken to the hospital.
On cross-examination, Y.O. reiterated she was frightened of defendant and stated that she had heard him brag about beating up girls who refused to have sex with him. She also stated that she thought screaming for help would be futile because defendant was bigger than the other teenagers and everyone was afraid of him.
Dustin LeBleu also testified for the State. Dustin was originally charged with aggravated rape in conjunction with defendant. The defense elicited from Dustin that the district attorney had agreed to drop the charge in exchange for Dustin’s testimony. At the time of trial, Dustin was serving two years at the Louisiana Training Institute as a result of other crimes.
Dustin’s version of events begins to differ substantially from the point where Quincey took the mattress and left the room. Dustin testified that defendant asked Y.O. if she had sex with Dustin and if she had liked it. She allegedly answered yes to both questions. Dustin corroborates Y.O.’s testimony that she was evasive when defendant asked her about having sex with the defendant. At this point another teenager, Kim Hicks, who Dustin believed was rather intoxicated, opened the door, but quickly shut it after excusing herself. Defendant continued asking Y.O. if she wanted to have sex while she ^continued to state, “I don’t know” and “Wait, let me think about it.” At one point Dustin remembered Y.O. saying she did not “want to get on our [defendant and Dustin] bad side.” Dustin testified as to defendant’s response:
“And he said, ‘My name is Charles Raymond Matthews, and I’m known very well in Lafayette, and if anybody ever fucks with me I’ll have them killed.’
She just shut up totally from that moment. She didn’t say anything from then on.... She was just kind of seared. She was like in a daze.”
*857 Defendant then sat on the box springs and began kissing Y.O. and put his hand in her pants. Kim again stumbled against the door and looked in stating, “Oh, excuse me. I didn’t mean to interrupt. You all are being bad in here?” She then closed the door. It was at this point that Dustin remembered defendant placing the footlocker against the door. He stated that after defendant went back to Y.O., that she stood up allowing him to pull her pants down to her knees. Defendant then laid her back on the bed and finished removing her pants. Dustin said his attention was diverted from defendant and Y.O. because Beth began throwing up. Concerned that Beth might choke on her own vomit, he tended to her, moving her onto a clean blanket and cleaning her up as well as he could. During this time, Dustin corroborated Y.O.’s testimony about defendant asking her to say how much she liked the intercourse. Dustin testified that Y.O. was repeating mechanically what the defendant said. “I could very faintly hear her saying exactly what he said, when he told her to do it — to say whatever — you know, it was like an echo.” After the defendant finished having sex with Y.O., he left the room. Dustin said he asked Y.O. if she was O.K. He recalled her reply as being “Well, now everybody is going to really think I’m a slut because of this.” Dustin said that he assured her he would not say anything and Y.O. hugged him. Dustin stated that they started kissing and this led to sexual intercourse. Afterwards, both got dressed and returned to the living room.
Crystal Meaux also testified briefly at trial. Her testimony confirmed that Y.O. told her Saturday morning that defendant and Dustin had raped her. Crystal also remembered earlier in the evening overhearing defendant saying something to Dustin about “pulling a train” with Y.O. Dustin explained this was slang for having sex.
1 ..SUFFICIENCY OF THE EVIDENCE
‘When the issue of sufficiency of evidence is raised on appeal, the critical inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. It is the province of the jury and not that of the appellate court to assess the credibility of witnesses. The appellate court cannot reevaluate credibility of witnesses and then proceed to overturn a factual determination of guilt. Where a trier of fact has made a rational credibility determination, an appellate court cannot disturb it on review.” State v. Pontiff, 604 So.2d 71, 75 (La.App. 3 Cir.1992). (citations omitted).
Pontiff involved a very similar factual situation. Both the defendant and victim in Pontiff were 15 years of age. They had not socialized previously together, but attended the same high school. The night started with the victim going out with a girlfriend and several teenage boys who were acquaintances of the girlfriend. At some point the victim ended up alone in a backyard with the defendant and one of the other boys. The victim testified that the defendant forced her to have sex while the other boy restrained her. Both boys contended that the victim consented to having sex. Like the case sub judice, there was no physical evidence indicating the victim had been involved in a violent assault. The Pontiff defendant was indicted and charged for aggravated rape and the jury returned a verdict of forcible rape. In finding the evidence was sufficient to support a conviction, the Pontiff court noted:
“The jury, sitting as the trier of fact, had the distinct opportunity to view each individual witness’s demeanor, listen to their respective testimony, and assess credibility. Their firsthand knowledge of the witnesses’s testimony is an immeasurable advantage when compared to our limited review within the four corners of the cold record.” Id. at 76.
The same principle applies to the case sub judice. The conviction turned on whether the jury found Y.O. or Dustin more credible. The jury chose to believe the victim. Y.O.’s testimony clearly was sufficient evidence that *858 the defendant committed the crime of forcible rape, which is defined as:
“Forcible rape is a rape committed where the anal or vaginal sexual intercourse is deemed to be without the lawful consent of the victim because the victim is prevented from resisting the act by force or threats of physical violence under circumstances where the victim reasonably believes that such resistance would not prevent the rape.” LSA-R.S. 14:42.1(A)
IsY.O. testified that the defendant had sexual intercourse with her, that such intercourse was without her consent, and that despite trying to physically resist, her resistance was overcome by acts of force. Since the record contains sufficient evidence for a rational jury to find defendant guilty, we cannot re-evaluate this factual finding. Accordingly, the conviction of defendant is affirmed.
EXCESSIVE SENTENCE
Defendant contends that the sentencing court erred in denying his motion to reconsider sentence. Defendant does not contest the correctness of the Department of Probation and Parole’s determination that his criminal history placed him in the “1-A” category (360 — 330 months of incarceration). Instead, defendant argues that the sentencing court improperly deviated from the Felony Sentencing Guidelines (FSG) which provides for a maximum incarceration of 360 months for an offender, such as defendant, in the FSG grid cell classification, 1-A, and imposed an excessive sentence.
LSA-R.S. 14:42.1 provides that upon conviction for forcible rape, the sentencing court shall impose imprisonment at hard labor for not less than 5 years, but not more than 40 years, and at least 2 years of the sentence shall be without benefit of parole, probation, or suspension of sentence. In the case sub judice, the sentence imposed falls within the statutory maximum provided.
The imposition of a sentence, although within the statutory limit, may violate a defendant’s constitutional right against excessive punishment. State v. Cann, 471 So.2d 701 (La.1985). A sentence is considered excessive and unconstitutional if it is grossly out of proportion to the severity of the crime or nothing more than the purposeless and needless imposition of pain and suffering. State v. Telsee, 425 So.2d 1251 (La. 1983). The sentencing court is given wide discretion in imposing a sentence, and a sentence imposed within statutory limits will not be deemed excessive in the absence of manifest abuse of discretion. State v. Sepulvado, 367 So.2d 762 (La.1979).
LSA-C.Cr.P. Art. 894.1, as amended, focuses on the Louisiana Felony Sentencing Guidelines, the Louisiana Sentencing Commission’s recommended sentences in felony eases. In State v. Smith, 93-K-0402 (La. 7/5/94), 639 So.2d 237, the Louisiana Supreme 17Court stated:
“[T]he enabling legislation, as well as the related Code of Criminal Procedure articles and the Guidelines themselves, are explicit and uniform in their direction that the Guidelines are advisory in nature. There is no codal or statutory requirement for record justification by the trial judge of his decision to deviate from the Guidelines and impose a sentence* other than that which is suggested by the Guidelines. The only mandatory aspects of the statutory scheme are contained in La.Code Cr.P. art. 894.1, which requires the trial judge to consider the Guidelines, and to state for the record the considerations taken into account and the factual basis for the sentence imposed. The requirements of La. Code Cr.P. art. 894.1 attach whether the trial judge chooses to adhere to or instead deviate from the sentence recommended by the Guidelines.” (Slip op. at 7-8, 639 So.2d at 242).
In the present case, the sentencing court provided the following reasons for its sentencing choice:
“I’m provided here with a Presentence Report pursuant to your request, and it has been indicated that at least nineteen (19) episodes with the law has [sic] occurred during your adult record, which has not been very, very, long.
‡ ⅝ ⅜ ⅜ ⅜ ⅜
This, of course, is the third felony that you’ve come before a court. You were *859 given leniency on the two (2) previous occasions. By operation of law, this Court at this time cannot suspend a sentence any longer.
⅜ ‡ ⅜ ⅜ ⅜ ⅜
Certainly the Court takes into consideration the family life that you would like to have, but you had this opportunity all along and you threw it away. This is your third time.
The Court also notes with interest that you also have a pending charge against you for intimidating a witness in this matter.
Concerning all of these factors here, and the Court at this time will file into evi- ■ denee the Presentenee Report, which speaks for itself. But the recommendation is that the Court sentence the accused to the maximum of forty (40) years to be considered by the Court, if it determines aggravating circumstances exists [sic]. The Court will file that in evidence, the whole report.
Also, the Court takes into consideration that it has also reviewed the juvenile record, which the Court will not comment further upon. But in order to have a total picture in this matter, the Court has considered the juvenile record; but especially and particularly the adult record.
The Court has no alternative but to arrive at this conclusion, and the Court arrives at the following sentence: that the accused ... is ... to serve a term of forty (40) years at hard labor, | gof which at least ten (10) years of the sentence imposed shall be without benefit of probation, parole, or suspension of sentence. Would it not be for your age, the court would have imposed a longer mandatory term.”
Section 209(B) of the FSG lists 18 specific aggravating circumstances. While the trial court did not label the facts it considered as “aggravating circumstances,” we find one instance mentioned in the trial court’s reasons which is clearly defined as an aggravating circumstance under the FSG.
Section 209(B)(7) defines the following circumstance as aggravating:
“Subsequent to the offense, the offender used or caused others to use violence, force, or threats with the intent to influence the institution, conduct, or outcome of the criminal proceedings.”
This clearly corresponds with the pending charge against defendant mentioned by the trial court of intimidating a witness in the proceeding. As the trial court has specified an aggravating circumstance, it was within its discretion in deviating from the sentencing guidelines.
Having found an upward departure from the Guidelines’ grid range appropriate, we now address defendant’s assertion that his sentence is excessive under the Louisiana constitution. Whether the term of imprisonment is too severe depends upon the circumstances of the case and the defendant’s background. State v. Jamison, 93-1638 (La.App. 3 Cir. 5/4/94); 640 So.2d 438. In the present case, after considering the factors considered by the sentencing court, we do not find that defendant’s sentence constitutes an unnecessary infliction of pain and suffering, nor does the sentence shock our sense of justice.
Therefore, we find no merit to defendant’s assignment of error.
ERROR PATENT
After reviewing the record, we find one patent error. LSA-C.Cr.P. Art. 930.8 provides that at the time of sentencing the sentencing court shall inform the defendant of the prescriptive period for post-conviction relief. The record in the present case shows that the court did not inform the defendant of the prescriptive period. This defect has no bearing on whether the sentence is excessive, and thus is not grounds to reverse the sentence or ^remand for resentencing.
The three year prescriptive period does not begin to run until the judgment is final under LSA-C.Cr.P. Arts. 914 or 922; so prescription is not yet running. Apparently, *860 the purpose of Article 930.8(C) is to inform defendant of the prescriptive period in advance. Thus, we direct the trial court to inform the defendant of the provisions of LSA-C.Cr.P. Art. 930.8 by sending appropriate written notice to the defendant within 10 days of the rendition of this opinion and to file written proof that the defendant received the notice in the record of the proceedings. See State v. Reeves, 613 So.2d 1061 (La.App. 3 Cir.1993).
CONCLUSION
For the above and foregoing reasons, the conviction and sentence are affirmed with directions as stated hereinabove. Costs of this appeal are assessed to the defendant.
AFFIRMED WITH INSTRUCTIONS.