# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

### 03-1079

**STATE OF LOUISIANA**

**VERSUS**

**BILLY FRANK JACKSON**

**********

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 20083-01
HONORABLE ARTHUR J. PLANCHARD, DISTRICT JUDGE

**********

**MARC T. AMY
JUDGE**

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Marc T. Amy, and Michael G. Sullivan, Judges.

**AFFIRMED.**

Thibodeaux, C.J., dissents and assigns written reasons.

**Robert Richard Bryant, Jr.**
**District Attorney**
**Post Office Box 3206**
**Lake Charles, LA 70602**
**(337) 437-3400**
**COUNSEL FOR APPELLEE:**
    **State of Louisiana**

**Edward Kelly Bauman**
**Louisiana Appellate Project**
**Post Office Box 1641**
**Lake Charles, LA 70602-1641**
**(337) 491-0570**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Billy Frank Jackson**

**Billy Frank Jackson**
**Louisiana State Prison**
**Camp-C Jaguar 2-L-11**
**Angola, LA 70712**

AMY, Judge.

The defendant was convicted of simple burglary, aggravated rape, two counts of second degree kidnaping, and theft of goods over $500.00. The defendant appeals the conviction for aggravated rape, alleging the State presented insufficient evidence to support the charge. For the following reasons, we affirm and remand with instructions.

**Factual and Procedural Background**

The offenses alleged in this matter occurred on September 29, 2001 at a house in Lake Charles, Louisiana. The record reveals that, on that date, R.M.[1] and a friend, Johnette Duhon, arrived at the house where they were finishing a painting job. The house was for sale, with the owners visiting only occasionally.

According to the testimony of R.M. and Ms. Duhon, they found the door unlocked upon arriving at the house. After they entered, Ms. Duhon went upstairs to turn on lights. While upstairs she encountered the defendant, Billy Frank Jackson. The record indicates that the defendant was homeless and had been staying in the house. As will be discussed in detail below, the State alleged that the defendant forced Ms. Duhon downstairs, holding a pair of scissors to her neck, and that the two joined R.M. Eventually, the State alleges, the defendant forced both women upstairs, bound Ms. Duhon, and locked her in a closet. After doing so, the State alleges, the defendant raped R.M. and eventually also locked her in a bathroom. The defendant subsequently escaped, taking R.M.'s truck. The women escaped, contacting authorities.

---

[1]Pursuant to La.R.S. 46:1844(W), the victim's initials are used throughout for confidentiality purposes.

The defendant was subsequently arrested in Houston, Texas. On November 29, 2001, the defendant was charged by indictment of aggravated burglary, a violation of La.R.S. 14:60, aggravated rape, a violation of La.R.S. 14:42, two counts of second degree kidnaping, violations of La.R.S. 14:44.1, and theft of an item valued at over $500,00, a violation of La.R.S. 14:67. The defendant waived formal arraignment and pled not guilty to the charges. After a trial by jury, the defendant was convicted as charged for aggravated rape, second degree kidnaping and theft, but on the charge of aggravated burglary, he was convicted of the responsive offense of simple burglary.

On the aggravated rape conviction, the defendant was sentenced to life imprisonment without the benefit of parole, probation, or suspension of sentence. For simple burglary, the defendant was sentenced to ten years in the Department of Corrections. For each count of second degree kidnaping, the defendant was sentenced to twenty years without benefit of parole, probation or suspension of sentence. Finally, for theft, the defendant was sentenced to serve ten years. Each of the latter four sentences were ordered to be served concurrent with the life sentence for aggravated rape.

The defendant appeals, questioning the sufficiency of the evidence for the aggravated rape conviction.

**Discussion**

*Patent Error*

In accordance with La.Code Crim.P. art. 920, we have reviewed this matter for errors patent on the face of the record. We find two such errors.

First, we observe an error in the grand jury indictment charging the defendant. Along with the above-referenced crimes, the defendant was charged with "Aggravated

3

Rape." Reference was made to La.R.S. 14:42, the statute defining aggravated rape. However, in the description of the offense, the indictment reads as follows:

> COUNT II: BILLY FRANK JACKSON DID ENGAGE IN VAGINAL SEXUAL INTERCOURSE WITH [R.M.], A FEMALE, WHO IS NOT THE SPOUSE OF THE DEFENDANT AND WITHOUT THE VICTIM'S LAWFUL CONSENT AND UNDER CIRCUMSTANCES WHEREIN THE VICTIM WAS PREVENTED FROM RESISTING THE ACT BY FORCE OR THREATS OF PHYSICAL VIOLENCE UNDER CIRCUMSTANCES WHERE THE VICTIM REASONABLE [sic] BELIEVED THAT SUCH RESISTANCE WOULD NOT HAVE PREVENTED THE RAPE.

Rather than tracking the language of La.R.S. 14:42, the latter portion of the above description closely follows the description of forcible rape contained in La.R.S. 14:42.1.[2]

Louisiana Constitution Article I, § 15 provides that: "Prosecution of a felony shall be initiated by indictment or information, but no person shall be held to answer for a capital crime or a crime punishable by life imprisonment except on indictment by a grand jury." With regard to the content of an indictment, La.Code Crim.P. art. 464 provides:

> The indictment shall be a plain, concise, and definite written statement of the essential facts constituting the offense charged. It shall state for each count the official or customary citation of the statute which the defendant is alleged to have violated. Error in the citation or its omission shall not be ground for dismissal of the indictment or for reversal of a conviction if the error or omission did not mislead the defendant to his prejudice.

---

[2]La.R.S. 14:42.1 provides, in pertinent part:

A.     Forcible rape is rape committed when the anal, oral, or vaginal sexual intercourse is deemed to be without the lawful consent of the victim because it is committed under any one or more of the following circumstances:

(1)     When the victim is prevented from resisting the act by force or threats of physical violence under circumstances where the victim reasonably believes that such resistance would not prevent the rape.

4

In the present case, we do not have error in the citation, but rather a discrepancy between the statute number and the description of the offense provided. Although the defendant has not complained of the conflict, we address the difference in the provisions, as it is discoverable by the inspection of the pleadings/proceedings.

La.Code Crim.P. art. 487 provides:

> A. An indictment that charges an offense in accordance with the provisions of this Title shall not be invalid or insufficient because of any defect or imperfection in, or omission of, any matter of form only, or because of any miswriting, misspelling, or improper English, or because of the use of any sign, symbol, figure, or abbreviation, or because any similar defect, imperfection, omission, or uncertainty exists therein. The court may at any time cause the indictment to be amended in respect to any such formal defect, imperfection, omission, or uncertainty.
>
> Before the trial begins the court may order an indictment amended with respect to a defect of substance. After the trial begins a mistrial shall be ordered on the ground of a defect of substance.
>
> B. Nothing contained herein shall be construed to prohibit the defendant from entering a plea of guilty to a crime nonresponsive to the original indictment when such a plea is acceptable to the district attorney, and in such case, the district attorney shall not be required to file a new indictment to charge the crime to which the plea is offered.

In *State v. Birabent*, 305 So.2d 448 (La.1974), the Louisiana Supreme Court reviewed an indictment that described the offense of manslaughter, but on the reverse side of the indictment form, the endorsement read "Murder." After the first witness testified at trial, the defense counsel moved to limit evidence related to manslaughter. The State sought amendment of the bill or, alternatively, the declaration of a mistrial. The trial court granted the mistrial. On appeal, the State asserted that the indictment contained a substantive defect rendering the entry of the mistrial lawful. Therefore, the State argued, double jeopardy principles did not prevent prosecution of the defendant. In finding that the mistrial was illegally entered, the supreme court explained:

5

We acknowledge that a substantial defect in the indictment would be grounds under La.C.Cr.P. art. 775(3) for the declaration of a mistrial. Such a defect in the indictment would constitute "a legal defect in the proceedings which would make any judgment entered upon a verdict reversible as a matter of law." See Official Revision Comment (g) to La.C.Cr.P. art. 775. Therefore the central issue for our determination is whether the indictment which formed the basis for relator's prosecution contained a substantial defect.

There did not exist in this prosecution a legal defect which would render any judgment entered upon a verdict reversible as a matter of law. The indictment which formed the basis for the relator's prosecution was a perfectly valid indictment for the crime of manslaughter. The word "MURDER" and the alphabetical and numerical statutory designation "1950 L.R.S. 14:30" do not constitute any part of the finding of the grand jury; the endorsement is not a substantive part of the charge. See State v. Lawrence, 221 La. 861, 60 So.2d 464 (1952); see also State v. DeHart, 109 La. 570, 33 So. 605 (1903). Nothing which took place during the proceedings would have vitiated a judgment entered upon a verdict rendered at the close of trial.

*Id.* at 451 (footnote omitted).

While *Birabent* involved a situation where the defendant challenged the sufficiency of the indictment, and did so prior to conviction, the instant matter involves a situation where the defendant has never contested the indictment's sufficiency. The Louisiana Supreme Court has explained that, given La.Code Crim.P. art. 841"s requirement of contemporaneous objections, "a defendant may not raise the sufficiency of an indictment for the first time after conviction . . . especially when the charging document fairly informed him of the charge against him and the alleged defect did not prejudice him." *State v. Allen*, 01-2494, p.1 (La. 6/21/02), 824 So.2d 344, 344. The supreme court found that, by failing to allege that an indictment provides inadequate notice of the charge prior to trial, the defendant had waived the claim. *Id. See also State v. Thibodeaux*, 98-1673 (La. 9/8/99), 750 So.2d 916; *State v. Miller*, 99-950 (La.App. 3 Cir. 2/2/00), 757 So.2d 744; *State v. Clay*, 623 So.2d 211 (La.App. 2 Cir. 1993).

6

In the present case, the defendant has not questioned the sufficiency of the indictment nor asserted that he was in any way misled by the above-described conflict. Instead, it appears that this matter proceeded as an aggravated rape charge since institution of the prosecution. In addition to the two references to the crime of aggravated rape on the indictment, the defendant's motion for bill of particulars specifically seeks information related to the charge of "aggravated rape LSA R.S. title 14:42." In response to the bill of particulars, the State presented evidence indicating that the investigation phase of the proceedings was pursued as one for aggravated rape. Furthermore, in opening statements, both the State and counsel for the defendant referenced the charge as being one for aggravated rape, a charge on which the court instructed the jury. Given these factors, we do not find that the defendant was without notice of the charge. As the defendant did not raise this issue in pre-trial proceedings, the matter is now waived and does not require correction on appeal.

Also on patent error review, we observe that the defendant was not informed of the two-year time limit for filing post-conviction relief as required by La.Code Crim.P. art. 930.8. Accordingly, we remand this matter with instructions to the trial court to inform the defendant of the provisions of La.Code Crim.P. art. 930.8 within ten days of the rendition of this opinion. The trial court is further instructed to file written proof into the record that the defendant received the notice.

*Sufficiency of the Evidence*

In his sole assignment of error, the defendant contends that the State failed to introduce evidence sufficient to support the guilty verdict for aggravated rape. He argues the sexual relations were consensual and focuses on what he alleges are inconsistencies between R.M.'s trial testimony and her statements to the investigating detective. The defendant alternatively claims that, if this court finds the sexual

7

relations were not consensual, the degree of force was so minimal that a verdict of forcible rape should have been returned.

When sufficiency of the evidence is raised on appeal, the reviewing court considers whether the evidence, viewed in a light most favorable to the State, is sufficient to have convinced a rational trier of fact that the State has proven all elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979). *See also State v. Tate*, 01-1658 (La. 5/20/03), 851 So.2d 921.

In pertinent part, La.R.S. 14:42 defines aggravated rape as:

> A.    Aggravated rape is a rape committed upon a person sixty-five years of age or older or where the anal, oral, or vaginal sexual intercourse is deemed to be without lawful consent of the victim because it is committed under any one or more of the following circumstances:
>
> (1) When the victim resists the act to the utmost, but whose resistance is overcome by force.
>
> (2) When the victim is prevented from resisting the act by threats of great and immediate bodily harm, accompanied by the apparent power of execution.
>
> (3) When the victim is prevented from resisting the act because the offender is armed with a dangerous weapon.

The trial court instructed the jury as to Subparagraphs 1, 2, and 3.

The State presented evidence that R.M. and Ms. Duhon arrived at a Lake Charles house which they had been hired to paint. According to their testimony the back door was unlocked at the time of their arrival. The women entered the house, with Ms. Duhon going upstairs to turn on lights. R.M. inquired when she heard a strange sound coming from upstairs. Ms. Duhon replied, "No," but, according to R.M., not in her usual voice. While R.M. was deciding whether to call for help, the defendant entered the room with his arm over Ms. Duhon's chest. According to R.M., he had a pair of red-handled scissors to her throat.

8

R.M. testified that the defendant asked whether she had called the police. She told him "No." She explained that he then told her if she called the police, he would kill her friend. R.M. explained that he then checked to see what numbers had been dialed. According to R.M., the defendant still had the scissors on Ms. Duhon during this time. R.M. testified that she tried to keep a conversation going so that he would not kill them. She explained that she told the defendant that they were there to paint and that they were not going to hurt him.

According to R.M., she attempted to "ignore the situation," opening a can of paint and inquiring whether the defendant wanted a beer. Ms. Duhon stated that she wanted a cigarette. The defendant stated that he also wanted a cigarette. As the cigarettes were in R.M.'s truck, the defendant, still holding Ms. Duhon with the scissors, went to the truck. R.M. explained that she followed them. When asked at trial why she did not run, R.M. initially responded that she did not know, but shortly thereafter, she explained that she was not going to leave Ms. Duhon. R.M. stated that, after retrieving the cigarettes, the three returned to the house and the defendant started smoking a cigarette. R.M. stated that the defendant told her that he had "had enough of this and it was time to go upstairs." R.M. testified she told him "No . . . We're not going anywhere. We're staying right here in the kitchen. This is where the job needs to be done, I'm not going." According to R.M., the defendant said, "Yes, we're going." After putting the scissors in his pocket, he pulled out a knife and put it to Ms. Duhon's throat and said: "I said now. We're going upstairs."

R.M. denied remembering how the three arrived upstairs. However, she explained that, once upstairs, the defendant put down his lit cigarette and retrieved another pair of scissors, ones with black handles. He then used the scissors to cut various electrical cords. Although he was not holding either woman while doing so,

R.M. explained that there was only one way out of the hallway and it was "right over him."

R.M. testified that she continued to talk to the defendant and that he told her "that he had killed a woman in Houston and he would not hesitate killing two more, for me to shut up." Although Ms. Duhon denied hearing the defendant verbalize a threat, R.M. testified that the threat was made after Ms. Duhon was put into a closet.

R.M. explained that the defendant gave her a cord, and told her to tie up Ms. Duhon. She stated that the defendant then tied it tighter and put either the knife or scissors to Ms. Duhon's shoulder and pushed her into a closet. The defendant then attempted to tie two doorknobs together. R.M. testified she did not leave at that point because, "he would've killed one of us. He'd have got hold to Johnny then if I would've left." The defendant was unable to tie the doorknobs together, so he removed the cords and checked to make sure Ms. Duhon was not going anywhere. R.M. testified that the defendant told her to go into a room. She described the events that transpired at that point as follows:

> **A**   So, I walked in that room, and he had told me, he said, "I'm going to f - - - you" And I said, "I don't think you are." He said, "oh, yeah, I am." And I said, "You don't talk to me like that. You don't use that word to me. Nobody f - - - s me." And –
>
> **Q**   What did he do then?
>
> **A**   And he came up to me, he twisted my shirt around my neck, placed the knife on my throat; you do it or I do it.
>
> **Q**   And what did you do?
>
> **A**   I told him that I was afraid of the knife and I didn't want it anywhere around me, that he was giving me no choice, that I had no choice. He said, "This is how it has to be. I said, "I don't want to see the knife. I don't want it on me." So, he told me to get down on that bed; I told him, "No." I said, "I don't want to be in this room, I want to go in the room that has the waterbed."

**Q** Why was that?

**A** Because they had some weapons in there that could've been used.

**Q** Was it weapons?

**A** There were drum stands, there were stainless steel drum stands that were folded on the floor.

**Q** Okay.

**A** So - -

. . . .

**Q** Okay. You're in the room with the drum stands.

**A** So, I was sitting on the bed, and he went back into the hallway to tie Johnny's door up more.

. . . .

**Q** And then what did he want?

**A** He told me, he says, you stay in there; I said, "I'm not staying in there by myself," because I needed to know wherever he was, and I needed Johnny to be okay.

**Q** Okay.

**A** Because as long as, you know, all three of us were there, you know - - so, he finished tying the doorknob and that, we went into the room, and he pushed me on the floor. I told him to leave the light on because, I said, "I want to see your face."

**Q** Why did you say that?

**A** I didn't know who he was.

**Q** And then what?

**A** He got on top of me and he had intercourse with me.

**Q** Now, where were you laying when this happened?

**A** On the floor.

. . . .

11

**Q** Why not on the bed?

**A** Because I needed to get close to the stands, and another thing I was thinking, if he'd get in there and he'd push me in that waterbed, I wouldn't have enough time to get out before he killed me.

**Q** Okay. You said he had intercourse with you.

**A** Uh-huh. (yes)

**Q** So, does that mean he penetrated you vaginally?

**A** Yes.

**Q** With his penis?

**A** Yes.

**Q** Now, while he was doing this, were you talking to him?

**A** Yes.

**Q** What were you saying?

**A** [Pause] [crying] Um, I was just telling him how wonderful he was and what a man he was.

**Q** Why were you doing that?

**A** Because I didn't want to die.

**Q** Did you think that would keep him from killing you?

**A** I don't know, but I wasn't going to fight him.

**Q** And then at some point, he was having problems, correct?

**A** Uh-huh. (yes)

**Q** What was that?

**A** He was having to hold himself because he couldn't control himself, because he couldn't handle me talking to him.

**Q** And what did he do?

**A** He was getting worried, so he pushed me away, and when he did that, the only thing - - he was headed back to the hallway and that's where the knife was.

**Q** What did you do whenever he pulled away from you?

**A** I grabbed his arm and I told him, I said, "You're not finished yet, you're not going anywhere."

**Q** Why did you do that?

**A** Why?

**Q** Yes.

**A** One thing, he would never expect is for someone to say something like that, and I didn't want him to go get that knife.

**Q** Why would he go get the knife?

**A** Because he already got what he wanted.

**Q** When you did that, you pulled him back, what happened?

**A** I told him, I said, you know, I said, "I wish we would've met under different circumstances because," I said, "you're such a man."

**Q** Did you mean that?

**A** No.

**Q** Well, what happened when you told him that?

**A** He told me he was going to have to tie me up, and I said, "no."

The defendant then pushed R.M. into a bathroom. She stated that she could hear the defendant trying to tie something to the door. A short time later, the defendant opened the door, asked for her shoes, and then continued his attempts to tie the door. R.M. explained that, about five to ten minutes later, she heard her truck start. She kicked the door of the bathroom, and after getting out, she went to a window where she watched the defendant drive off in her truck. R.M. then told Johnette to stay where she was and not to make a sound. R.M. then went for help.

13

R.M. was questioned at trial about her behavior toward the defendant. She explained that she was "being passive to someone that was being aggressive[.]" When R.M. was asked if she tried to "get inside his head in some way," she stated that she was doing what she had been taught in a course. She explained that it was not that she was being friendly to him, she just attempted to remain calm and talked continuously. R.M. maintained that she did not want to have sex with the defendant and that she did so because she thought he was going to kill them if he did not get what he wanted. She testified that the defendant told her he was not going to hurt her *after* she was put in the bathroom. R.M. was asked if she heard the defendant say downstairs that he was not going to hurt her. She explained that the statement in question was directed to Ms. Duhon, not her.

At trial, the investigating police officer, Detective David Rupf of the Lake Charles City Police Department, testified that R.M. told him that when the defendant tried to get off of her, she grabbed him and told her it had been a long time since she had been with a man and that he was going to finish. In R.M.'s testimony, she denied telling the police this. She said this may have been their "form of it," but she denied making that particular statement. R.M. testified that she asked the defendant where he was going and told him he was not finished yet "because he was headed . . . to the hallway, and he wasn't going to kill me." Detective Rupf testified that he did not recall R.M. telling her that the defendant twisted her shirt around her neck while holding a knife to her.

As for the location of the weapons during the rape, R.M. testified the defendant did not have the knife, but he still had the scissors. It is not clear from the victim's testimony if the scissors were in his hand or lying on the floor. R.M.'s testimony regarding the location of the weapons during the rape was as follows:

14

**Q**      Now, once you're in the hallway walking from room to room, isn't it true that you told him that you were scared of the knife and would not have sex with him unless he put the knife down?

**A**      I told him I was afraid of the knife and I wouldn't have anything to do with him unless he put the knife down.   But he still had the scissors.

. . . .

**Q**      Did you tell him - - tell the police that you made him keep his hands on your body so you knew where his hands were at all times?

**A**      He had one hand on his penis and the other hand was on my shoulder, holding me down; and the scissors were next to my head.

In *State v. Pontiff*, 604 So.2d 71 (La.App. 3 Cir. 1992), a panel of this court reviewed a conviction for forcible rape that involved very disputed facts.   In its application of the *Jackson* standard of review, the court stated:

> This case clearly presents a classic divergence of testimony.  The victim characterized defendant's actions as an act of rape, and the defendant maintained that the victim consented to sexual intercourse. Thus, the determination of the sufficiency of the evidence hinges upon witness credibility.  It is well established in our jurisprudence that the fact finder may accept or reject, in whole or part, the testimony of any witness.  *State v. Nolan*, 503 So.2d 1186 (La.App. 3rd Cir.1987), writ denied, 507 So.2d 226 (La.1987).

> The jury, sitting as the trier of fact, had the distinct opportunity to view each individual witness's demeanor, listen to their respective testimony, and assess credibility.  Their firsthand knowledge of the witnesses's testimony is an immeasurable advantage when compared to our limited review within the four corners of the cold record.  In the case *sub judice*, the jury chose to believe the testimony of the victim along with the testimony of Dr. Bouillion over defendant's denials.  Since the record fully supports the jury findings, this court will not engage in reevaluating the credibility of witnesses and reweighing the other evidence adduced at trial.

*Id*. at 76.

In the present case, the occurrence of sexual intercourse is undisputed; the contested issue is whether the sex was consensual. R.M. testified the defendant had a knife to her throat when he ordered her to undress.  Although the defendant put the

15

knife down prior to the rape, R.M. testified the defendant had one hand on her shoulder and the scissors were near her head. Although it is not clear whether the scissors were actually in the defendant's hand during the perpetration of the rape, the jury was reasonable in determining that they were easily accessible to him. The victim testified that she had sex with the defendant because she thought he was going to kill them if he did not get what he wanted. Furthermore, the jury heard R.M.'s testimony and the defendant's videotaped statement to police and was made aware of inconsistencies in R.M.'s testimony pointed to by the defense. After hearing these versions of events, the jury found credibility in that of R.M. After instruction on both forcible and aggravated rape, the jury returned a verdict of guilty of aggravated rape. In light of the credibility determination inherent in the verdict and the testimony contained in the record, we conclude that a rational trier of fact could have found the essential elements of aggravated rape proven beyond a reasonable doubt. Accordingly, under the dictates of the *Jackson* standard, the conviction for aggravated rape is affirmed.

This assignment lacks merit.

**DECREE**

For the foregoing reasons, the defendants convictions are affirmed. This matter is remanded and the trial court instructed to inform the defendant of the time delays of La.Code Crim.P. art. 930.8. The trial court is further instructed to file written proof into the record that the defendant received the notice.

**AFFIRMED.**

STATE OF LOUISIANA

VERSUS

BILLY FRANK JACKSON


THIBODEAUX, J., dissenting.


The majority concludes that the Defendant's failure to object to the sufficiency of the indictment waives any argument regarding that indictment. Further, the facts support a finding that the Defendant was not without notice of the charge of aggravated rape. I disagree.

It was unnecessary for the Defendant to question the sufficiency of the indictment. The indictment was sufficient to charge a valid crime—the crime of forcible rape. The indictment does not violate La.Code Crim.P. art. 487. It does not contain "any defect or imperfection in, or omission of, any matter of form only," nor is it insufficient "because of any miswriting, misspelling, or improper English, or because of the use of any sign, symbol, figure, or abbreviation, or because any similar defect, imperfection, omission, or uncertainty exists therein." La.Code Crim.P. art. 487(A). The indictment conforms with La.Code Crim.P. art. 464 in that it is "a plain, concise, and definite written statement of the essential facts constituting the offense charged." La.Code Crim.P. art. 464. While there is a discrepancy between the statute number and the description of the crime charged, "[e]rror in the citation or its omission shall not be ground for dismissal of the indictment or for reversal of a

conviction if the error or omission did not mislead the defendant to his prejudice." La.Code Crim.P. art. 464.

The charging document, the indictment, fairly informed him of the charge of forcible rape. While the majority finds that the Defendant was not without notice of the charge of aggravated rape, a bill of particulars is not a "charging document" nor is an opening statement a "charging document."

In *State v. Birabent*, 305 So.2d 448 (La.1974), *cert. denied*, 423 U.S. 825, 96 S.Ct. 39 (1975), the grand jury charged the defendant with having unlawfully killed the victim, which conformed to the short-form indictment for manslaughter as set out in La.Code Crim.P. art. 465. However, the back of the indictment contained the endorsement "murder." After the first witness testified, the error was called to the court's attention by defense counsel, who moved that the court restrict the reception of evidence to that pertaining to manslaughter. The court agreed and at that point, the state requested it be allowed to amend the bill or that the court grant a mistrial. The judge granted a mistrial and the following month, the state filed a motion seeking to correct the indictment to charge murder. At the hearing on the motion, the grand jury foreman testified that the grand jury had voted to indict the defendant for murder. Thus, the court allowed the correction of the bill and an arraignment date was set. The defendant then filed a motion to quash the bill on the grounds of double jeopardy. Specifically, the defendant contended that the court erred in granting the mistrial because the charging instrument was a valid indictment for manslaughter; thus, to allow prosecution on a corrected bill would constitute double jeopardy. The trial court denied the motion to quash. On appeal, in addressing whether the reprosecution of the defendant would constitute double jeopardy, the supreme court was called upon to determine whether the mistrial was legally ordered under the provisions of La.Code Crim.P. art. 775. The ground for a mistrial which was at issue was whether "[t]here

2

[was] a legal defect in the proceedings which would make any judgment entered upon a verdict reversible as a matter of law." The court stated:

> We acknowledge that a substantial defect in the indictment would be grounds under La.C.Cr.P. art. 775(3) for the declaration of a mistrial. Such a defect in the indictment would constitute "a legal defect in the proceedings which would make any judgment entered upon a verdict reversible as a matter of law." See Official Revision Comment (g) to La.C.Cr.P. art. 775. Therefore the central issue for our determination is whether the indictment which formed the basis for relator's prosecution contained a substantial defect.
>
> There did not exist in this prosecution a legal defect which would render any judgment entered upon a verdict reversible as a matter of law. The indictment which formed the basis for the relator's prosecution was a perfectly valid indictment for the crime of manslaughter. The word "MURDER" and the alphabetical and numerical statutory designation "1950 L.R.S. 14:30" do not constitute any part of the finding of the grand jury; the endorsement is not a substantive part of the charge. [FN 2][1] See State v. Lawrence, 221 La. 861, 60 So.2d 464 (1952); see also State v. DeHart, 109 La. 570, 33 So. 605 (1903). Nothing which took place during the proceedings would have vitiated a judgment entered upon a verdict rendered at the close of trial.

*Id.* at 451.

The supreme court concluded the trial court had improperly granted the mistrial and thus erred in denying the motion to quash.

In *State v. Brown*, 506 So.2d 1261 (La.App. 2 Cir. 1987), one of the charges in the original bill filed against the defendant was titled, "Poss. Sch. II w/Intent." The body of the bill stated that the defendant committed the offense of "Poss. Sch. II w/Intent" in that he "did knowingly and intentionally possess and have

---

[1]2 Even if the face of the indictment and the back could be read together to charge murder (see State v. Cooper, 249 La. 654, 190 So.2d 96 (1966)), the indictment would still support a verdict. The defendant would have been in jeopardy for murder. Errors in court rulings are not attributable to defendant. A court order of a mistrial under the indictment (if read as a murder indictment) without a motion by defendant constitutes double jeopardy.

under his control, a Schedule II, controlled dangerous substance, to-wit. Preludin (Phenmetrazine)," *Id.* at 1262. Thus, both the title of the bill and the body charged the defendant in count two with possession of a Schedule II substance with intent to distribute; however, as written, the defendant was charged with simple possession. Prior to trial, the judge noticed the discrepancy and noted to counsel that the charges were improperly joined as the modes of trial were different. After the error was pointed out, the state moved to sever the counts, stating it would file a new bill as to the second count. Trial commenced with a six person jury. Thereafter, the state formally filed the new bill of information which charged the defendant with simple possession. Defense counsel objected to the filing of the new bill and, on appeal, argued the trial court should have granted a mistrial as the amendment to the bill was one of substance which should not have been allowed after trial had begun. In addressing the claim, the second circuit stated:

> The Code of Criminal Procedure clearly indicates that the nature of the charge against a defendant is determined by the "indictment." An indictment is defined as the written accusation of the crime. LSA - - C.Cr.P. Art. 383. More specifically, it is defined as "a plain, concise and definitive [sic] written statement of the essential facts constituting the offense charged." LSA - C.Cr.P. Art. 464. Thus, it is not the title of the offense which is determinative of the nature of the offense or "indictment," but it is rather the substance thereof. See also, *State v. Birabent*, 305 So.2d 448 (La.1974). Indeed, as Art. 464 points out, error in the citation of the offense, or even its omission, is not grounds for dismissal or reversal absent a showing of prejudice, although the article requires that the customary statutory citation be provided for each offense charged.
>
> Thus, it is clear that the amendment of the bill to change the title of the offense charged is not one of substance and is therefore an amendment which may occur after trial has commenced.

*Id.* at 1264.

4

As mentioned previously, the caption of the indictment states the Defendant was charged with aggravated rape. The body of the indictment also refers to aggravated rape and a violation of La.R.S. 14:42; however, the body of the charge tracks the forcible rape statute. Under the above cited case law, the written charge would be considered, in which case the Defendant was charged with forcible rape, not aggravated rape.

Following *Birabent*, the indictment was a valid indictment for forcible rape. To avoid the danger of a double jeopardy violation, we should examine the evidence and determine whether the elements of forcible rape, the offense validly charged in the indictment, were proven at trial. The elements of forcible rape were clearly proven given the fact the Defendant was armed with a dangerous weapon and the victim testified she feared he would kill them if he did not get what he wanted. Additionally, we note the jury was instructed as to the elements of forcible rape, which is a valid responsive verdict to the crime returned by the jury. See La.Code Crim.P. art. 814. Thus, this court should enter a verdict of forcible rape and remand the case for resentencing.

For the foregoing reasons, I respectfully dissent.