NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

24-434

STATE OF LOUISIANA

VERSUS

TRAVIS SHANE RYAN

**********

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 12753-19
HONORABLE ROBERT LANE WYATT, DISTRICT JUDGE

**********

CANDYCE G. PERRET
JUDGE

**********

Court composed of Candyce G. Perret, Jonathan W. Perry, and Guy E. Bradberry, Judges.

AFFIRMED WITH INSTRUCTIONS.

**Edward Kelly Bauman**
**LA Appellate Project**
**P. O. Box 1641**
**Lake Charles, LA 70602-1641**
**(337) 491-0570**
**COUNSEL FOR DEFENDANT/APPELLANT:**
     **Travis Shane Ryan**

**Hon. Stephen C. Dwight**
**14th JDC District Attorney**
**P. O. Box 3206**
**Lake Charles, LA 70601**
**(337) 437-3400**
**COUNSEL FOR APPELLEE:**
     **State of Louisiana**

**John E. Turner**
**Assistant District Attorney 14th JDC**
**901 Lakeshore Drive, Suite 800**
**Lake Charles, LA 70601**
**(337) 437-3400**
**COUNSEL FOR APPELLEE:**
     **State of Louisiana**

**PERRET, Judge.**

Defendant, Travis Shane Ryan, was convicted of one count of computer-aided solicitation of a minor, two counts of pornography involving juveniles, three counts of pornography involving juveniles under thirteen, and one count of possession of CDS II, methamphetamine. He was then charged as and adjudicated a third habitual offender. Thereafter, Defendant was sentenced as a third habitual offender to the following sentences: ten years for the solicitation of a minor, twenty years each for the two counts of pornography involving juveniles, and sixty years on each of the three counts of pornography involving juveniles under thirteen. These sentences were to run concurrently to one another. Defendant was also sentenced to four years on the one count of possession of methamphetamine; however, this sentence was to run consecutively to the others.

On appeal, Defendant challenges the admission of certain evidence by the State and the effectiveness of his trial counsel. After review, we affirm with instructions.

**FACTUAL AND PROCEDURAL BACKGROUND:**

The National Center for Missing and Exploited Children ("NCMEC") notified the Louisiana Department of Justice that a Google user, i.e., Defendant, had uploaded images suspected of depicting child exploitation. After an initial review, Louisiana investigators issued subpoenas and obtained pertinent materials from Google. The materials included pornography depicting minor victims. When authorities arrested Defendant, they also found him to be in possession of methamphetamine. Further, investigators seized a phone from Defendant, which contained pornographic material involving minors.

On January 10, 2022, the State filed an amended bill of information charging Defendant with one count of computer-aided solicitation of a minor, a violation of La.R.S. 14:81.3; five counts of pornography involving juveniles under thirteen, violations of La.RS. 14:81.1(A)(1) and (E)(5)(a); and one count of possession of methamphetamine, a violation of La.R.S. 40:967(C). The parties began selecting a jury on January 17, 2023, and jury selection was completed on January 18.

The jury began hearing evidence on January 23, 2023; on January 24, it found Defendant guilty of computer-aided solicitation of a minor; three counts of pornography involving victims under thirteen, and two counts of the responsive charge of pornography involving juveniles (a violation of La.R.S. 14:81.1(A)(1)); and one count of possession of methamphetamine.

On April 26, 2023, the State filed a bill of information charging Defendant as a third habitual offender pursuant to La.R.S. 15:529.1. On July 17, 2023, the district court found Defendant to be a third habitual offender. At his sentencing hearing on July 19, the district court sentenced Defendant as a habitual offender to ten years for the solicitation conviction, twenty years each for the two counts of pornography involving juveniles, sixty years each for the three counts of pornography involving juveniles under thirteen, and four years for possession of methamphetamine. The sentences for the first six counts are concurrent. The drug-possession sentence is to run consecutively to the others.

Defendant now seeks review, assigning two errors: "I. The trial court erred in allowing the State to admit evidence without establishing authenticity of a sufficient chain of custody," and "II. Trial counsel was ineffective in failing to file a motion to quash the jury venire."

2

**ERRORS PATENT:**

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find a potential error that amounts to being harmless, and a correction that is needed to the sentencing minutes and Uniform Sentencing Commitment Order.

The error involves the bill of information and the penalty for possession of methamphetamine. The bill of information charged Defendant with possession of methamphetamine but did not specify the weight of the methamphetamine found in Defendant's possession. The penalty for possession of methamphetamine is determined by the weight of the methamphetamine possessed. When the charge was read to the jury at the beginning of trial, no mention was made of the weight of the methamphetamine. However, during its opening statement, the State asserted that one of the elements it was required to prove was that Defendant possessed less than two grams of methamphetamine. Despite the State's note in the opening statement, in its verdict, the jury made no finding as to the weight of the methamphetamine possessed by Defendant.

Louisiana Revised Statutes 40:967(C) (emphasis added) provides the following penalties for possession of methamphetamine:

> C. Possession. It is unlawful for any person knowingly or intentionally to possess a controlled dangerous substance as classified in Schedule II unless such substance was obtained directly or pursuant to a valid prescription or order from a practitioner, as provided in R.S. 40:978 while acting in the course of his professional practice, or except as otherwise authorized by this Part. Any person who violates this Subsection with respect to:

> (1) An aggregate weight of less than two grams, shall be imprisoned, with or without hard labor, for not more than two years and, in addition, may be sentenced to pay a fine of not more than five thousand dollars.

3

(2) An aggregate weight of two grams or more but less than twenty-eight grams shall be imprisoned, with or without hard labor, for not less than one year nor more than five years and, in addition, may be sentenced to pay a fine of not more than five thousand dollars.

Louisiana Code of Criminal Procedure Article 470 provides: "Value, price, or amount of damage need not be alleged in the indictment, unless such allegation is essential to charge or determine the grade of the offense." Because the penalty for possession of methamphetamine is dependent on the weight of the substance possessed, the weight should have been charged in the bill.

Even so, we find the omission to be harmless. Louisiana Code of Criminal Procedure Article 487 provides, in pertinent part:

A. An indictment that charges an offense in accordance with the provisions of this Title shall not be invalid or insufficient because of any defect or imperfection in, or omission of, any matter of form only, or because of any miswriting, misspelling, or improper English, or because of the use of any sign, symbol, figure, or abbreviation, or because any similar defect, imperfection, omission, or uncertainty exists therein. The court may at any time cause the indictment to be amended in respect to any such formal defect, imperfection, omission, or uncertainty.

Before the trial begins the court may order an indictment amended with respect to a defect of substance. After the trial begins a mistrial shall be ordered on the ground of a defect of substance.

This court recently addressed a similar error patent in *State v. Bruner*, 23-35 (La.App. 3 Cir. 10/4/23) (unpublished opinion) (2023 WL 6461435). Bruner was charged with two counts of distribution of methamphetamine, with no specification in the bill of information as to the weight of the methamphetamine. *Bruner*, 23-35, p. 2. Finding the error was harmless, the court stated:

In *State v. Carr*, 52,273 (La.App. 2 Cir. 9/26/18), 256 So.3d 470, *writ denied*, 18-1815 (La. 4/8/19), 267 So.3d 611, the defendant asserted on appeal that his bill of information was defective because it did not allege the amount of cocaine he possessed. After noting that the defendant did not complain of the alleged error before his conviction, the second circuit explained that he failed to demonstrate

4

"how the omission misled him to his prejudice as required by La.C.Cr.P. art. 464." *Carr*, 256 So.3d at 477.

Louisiana Code of Criminal Procedure Article 464 states:

> The indictment shall be a plain, concise, and definite written statement of the essential facts constituting the offense charged. It shall state for each count the official or customary citation of the statute which the defendant is alleged to have violated. Error in the citation or its omission shall not be ground for dismissal of the indictment or for reversal of a conviction if the error or omission did not mislead the defendant to his prejudice.

Unlike *Carr*, Defendant here fails to allege any error in the bill of information and fails to allege that he was prejudiced by the failure of the bill of information to state the weight of the methamphetamine distributed. Defendant also did not raise any objection or lack of notice in the trial court.

In addition, because Defendant was tried by a six-person jury, all parties had to have understood that Defendant was being charged under the lower-weight penalty provision (less than twenty-eight grams). After all, the lower-weight penalty provision is punishable by imprisonment with or without hard labor, while the higher-weight penalty provision (twenty-eight grams or more) is punishable by imprisonment with mandatory hard labor. La.R.S. 40:967(B)(1). And as stated in La.Code Crim.P. art. 782, an offense that is punishable with mandatory hard labor shall be tried by a twelve-person jury, whereas an offense that is punishable with or without hard labor shall be tried by a six-person jury.

In summary, even though the bill of information failed to state the weight of the methamphetamine distributed by Defendant, the error in our view was harmless.

*Bruner*, 23-35, pp. 3–4.

Considering the State's assertion in its opening statement that it was required to prove Defendant possessed less than two grams of methamphetamine, it is apparent that, like *Bruner*, the lower-weight penalty provision was used in the present case. Additionally, the habitual offender sentence which was imposed for possession of methamphetamine fell within the range for both the lower and higher

5

weight sentencing provisions. Defendant does not complain of the error or allege prejudice.

In light of the foregoing, we find that the State's failure to allege the weight of the methamphetamine in the charging instrument was harmless. *See also State v. Jackson*, 03-1079 (La.App. 3 Cir. 2/4/04), 866 So.2d 358, *writ denied*, 04-1126 (La. 10/8/04), 883 So.2d 1027.

The minutes of sentencing and Uniform Sentencing Commitment Order need correction. According to the sentencing transcript, the district court ordered the sentences on counts one through six to be served without benefit of parole, probation, or suspension of sentence. The sentence imposed on count seven (possession of methamphetamine), was not imposed without benefit of parole. The minutes of sentencing state the following, in pertinent part:

> For oral reasons assigned, the Court sentences the defendant to serve ten (10) years as to Count 1; to serve twenty (20) years as to Counts 2-3; to serve sixty (60) years as to Counts 4-6; and to serve four (4) years as to Count 7, in the custody of the Louisiana Department of Corrections, with this time to be served at hard labor, without the benefit of probation, parole, or suspension of sentence, with credit for time served, with Counts 1-6 to run concurrently with each other and Count 7 to run consecutively to Counts 1-6.

Because the minutes include the statement regarding the denial of benefits after the listing of all the sentences imposed, it is not clear from the minutes if the denial of benefits applies to all of the sentences imposed or just to the last sentence listed, the sentence for count seven. Under either interpretation, the minutes incorrectly reflect that the district court imposed the sentence on count seven without benefit of parole. Additionally, the Uniform Sentencing Commitment Order indicates the district court ordered the sentence for count seven to be served without the benefit of parole, probation, or suspension of sentence. In the event of a conflict,

6

the sentencing transcript prevails. *State v. Williams*, 15-498 (La.App. 3 Cir. 12/9/15), 181 So.3d 857, *writ denied*, 16-26 (La. 1/13/17), 215 So.3d 242. Considering these inaccuracies, the district court is instructed to amend both the minutes of sentencing and the Uniform Sentencing Commitment Order to correctly reflect that Defendant's sentence for possession of methamphetamine, count seven, was not imposed without benefit of parole.

**ASSIGNMENT OF ERROR NO. 1:**

In his first assignment of error, Defendant argues the district court erred by ruling that State Exhibit S-101, a USB containing information linked to Defendant's Google accounts, was properly authenticated. Regarding authentication, the fourth circuit has explained:

> Authentication is a condition precedent to admissibility. La. C.E. art. 901(A). A party satisfies this condition by providing "evidence sufficient to support a finding that the matter in question is what its proponent claims." *Id.* A district court has great discretion in deciding whether a party laid a sufficient foundation for the admission of evidence. *State v. Ashford*, 2003-1691, p. 14 (La. App. 4 Cir. 6/16/04), 878 So.2d 798, 806. An appellate court reviews a district court's ruling on the admissibility of evidence under the abuse of discretion standard. *State v. Wright*, 2011-0141, pp. 10-11 (La. 12/6/11), 79 So.3d 309, 316.
>
> La. C.E. art. 901(B) provides examples of methods by which a party may authenticate evidence, one of which is the testimony of a witness with knowledge that the matter is what it claims to be. La. C.E. art. 901(B)(1). In *State v. Smith*, this Court reviewed the admissibility of social media evidence and applied the "reasonable juror" standard to the authentication of evidence under La. C.E. art. 901, explaining:
>
>> [W]e find the proper inquiry is whether the proponent has "adduced sufficient evidence to support a finding that the proffered evidence is what it is claimed to be . . . ." *Sublet* [*v. State*, 442 Md. 632], 113 A.3d [695,] 717 [(2015)] (quoting [*U.S. v.*] *Vayner*, 769 F.3d [125,] 131 [(2d Cir. 2014)]). Sufficient proof will vary from case to case, and "[t]he 'proof of authentication may be direct or circumstantial.'" *Id.* at 716 (quoting *Vayner*, 769 F.3d at 130). Consequently, the type and quantum of evidence will depend on the context and the purpose of its

7

introduction. Evidence which is deemed sufficient to support a reasonable juror's finding that the proposed evidence is what it is purports [sic] to be in one case, may be insufficient in another.

[*State v. Smith*,] 2015-1359, pp. 9-10 (La. App. 4 Cir. 4/20/16), 192 So.3d 836, 842.

Under this standard, we must determine whether the State offered sufficient facts from which a reasonable juror could find the evidence authentic. *Id.* If so, the district court did not abuse its discretion in ruling the social media posts admissible at trial. *Id.*

*State v. Groves*, 20-450, p. 29 (La. App. 4 Cir. 6/10/21), 323 So.3d 957, 975–76 (last alteration added). Thus, the burden of proof for authentication is low, and the standard of review on appeal is abuse of discretion.

At trial, the State sought to introduce a USB drive containing images collected from a Google account. To authenticate the USB exhibit, the State called Lisa Maher, a special agent with the Cyber Crimes Unit of the Louisiana Department of Justice as a witness. Maher explained that the department would receive all cyber tips from NCMEC, which she described as the "911 for the Internet." Maher explained that an email account was "flagged" for "possible illegal content" involving "suspected images and/or videos of child exploitation," turned over to NCMEC who created the cyber tip and sent it to the department. The following colloquy occurred:

Q. And when you learned that information, what was your first step in the investigation?

A. We reviewed the images and videos to confirm it to be of child sexual abuse material.

Q. And after reviewing it, what did you do next?

A. I issued subpoenas for the phone number and the upload IP address and a search warrant for the Google account.

Q. Okay. Let's start with the first two, if you don't mind.

8

A.    Sure.

Q.    So can you explain what an IP address is?

A.    An IP address acts kind of like a phone number when you login to a computer. So here at the courthouse if I were to get onto the computer and login to my Gmail account, it would capture that IP address because I'm connecting to the Internet here at the courthouse. So if I were to issue a subpoena for it, it would come back for this exact date and time to this courthouse.

Q.    And you said you did that in this case. What -- did you get a return?

A.    I did.

Q.    And what did you learn?

A.    That it came back to a third party. Like a -- another -- not a provider, but somebody who leased out the IP address.

Q.    Okay. And so how is it possible that someone could use their IP address?

A.    IP addresses, they -- at your home address you can have it protected or not. If you go to Starbucks, you can just logon to the Internet at Starbucks.

Q.    And so is your testimony that if somebody does not have a password protection on their Internet service, anyone could download something that would track back to their IP address?

A.    Correct.

Q.    And is that what you believe happened here?

A.    Yes.

Q.    So I want to ask you next, you mentioned you also got a subpoena for the telephone number.

A.    I did.

Q.    What were the results on that?

A.    So T-Mobile directed me to Tracfone, that they had resold the -- the information -- the phone number to Tracfone. And the subpoena response from Tracfone for the date I subpoenaed was not provided to me. It was provided for a date after the date of possession.

Q. Okay. And so for the date of possession or the date that they provided, what -- what had happened with the phone number? What did you learn?

A. That it was registered to a different individual.

Q. Okay. And is that common in your role, to find out that a phone number has changed?

A. Yes. Phone numbers -- if you give up your phone number, it's going to be reassigned.

Q. Great. So you mentioned the IP address, the phone number, and you mentioned the search warrant for the actual Google account.

A. That's correct.

Q. Can you explain what happened there?

A. So we received -- I received a response from Google and it contained things like - -

MS. TRAUB:

Object - - objection, Your Honor.

THE COURT:

I'm sorry?

MS. TRAUB:

Objection, Your Honor. Hearsay.

THE COURT:

Overruled. Go ahead.

MR. ROBINSON:

Thank you very much, Judge.

THE WITNESS:

I received the Google response, which I reviewed, which had things like the user name, recovery email addresses, IP logins, and the contents of the email address, the Google photos, and Google Hangouts, which is the chat application.

10

BY MR. ROBINSON:

Q.    Great.  And if I -- did -- how did this material come to you from Google?

A.    Through their law enforcement portal.

Q.    And have -- did you enter that information into evidence in any way?

A.    I believe I put it on a disc or a thumb drive and entered it into evidence.

Q.    Great. And when y'all do that, do you use any type of special packaging or barcoding or logging system?

A.    The evidence item number, we put evidence tape on it, and we put our name.  And then it's entered into evidence where it would fall.  So it would be 001A or 002A.

Q.    And so if I showed you a copy of the thumb drive that you entered into evidence from this case that you -- with the information you received from Google, would you be able to verify that it is what you received from Google?

A.    Yes, sir.

        . . . .

BY MR. ROBINSON:

Q.    Ms. Maher, I've handed you S-101.  Do you recognize that?

A.    This was the thumb drive that I put the Google return on.

Q     Great.  And you said, "That I put the Google return on."  Can you just briefly, once again, synopsize what exactly is on that thumb drive?

A.    The Google response, search warrant response, for the email address, travisshaneryan@gmail.com.

Q.    And how often did you receive -- in your role, how often did you receive data from Google and business records?

A.    All the time.

Q.    Does this seem to be in keeping with that practice?

A.    Yes, sir.

11

MR. ROBINSON:

Great. In connection with that testimony, I would offer S-101.

. . . .

THE COURT:

All right. Let the record reflect the jury has exited the courtroom.

It's my understanding that the Defense wants to enter an objection to the introduction of S-101.

Mr. Monroe?

MR. MONROE:

That -- that's correct, Your Honor.

The -- I mean, if the Court wants a quick title for it, this is an objection to the authentication and foundation for S-101.

The State purports to have a USB. They want to introduce that USB. They do not want to introduce it as some concrete piece of physical evidence.

That USB is merely the -- the container for a mass of alleged files.

As Mr. Robinson said at the bench, while we were able to view a USB, which was -- to be clear, was not that USB. It was a copy of a report that the State Police implied was the same thing as the report that was on this USB. We have no way to confirm that.

. . . .

At this point Mr. Robinson wants to submit S-101, a USB. At that point, everything inside that then gets deemed admissible. Which means, he has to lay a foundation and authenticate everything on there. He's had this witness say, I received some stuff, allegedly from Google, and now I want to authenticate all of that and provide foundation as a law enforcement officer.

Ms. Maher does not work for Google, has never worked for Google, does not know the process by which Google went and got that information. She just knows she purportedly received it from them.

That is over and above the hearsay objection to information provided by someone who is not here to testify to the providence of that.

If the State wants to say that this is a business record . . . . the Code is absolutely clear . . . . That requires someone who can testify as a records custodian for Google that they do in fact keep this in the normal course of business. . . .

And so the State - - the State is trying to say, because law enforcement got this from this person and this person and this person, we're going to skip over all of the prerequisites and introduce it all at once with no possibility for the Defense to object or confront any witnesses that might claim these came from Mr. Ryan's IP address of his phone or his person.

We don't have access to those people to ask these questions. And so this witness is clearly not the proper party to authenticate the stuff inside - - and I want to be clear, Judge. I'm not objecting to the USB itself. I'm objecting to what's inside it.

Over and above that, for the State to introduce what's inside it, we would insist that that document that their purported evidence be plugged into some device and then displayed, so that we are aware and the Court is aware of what is attempting to be introduced into evidence.

Because the Court cannot know. That could be blank. The State could be submitting a blank USB. And not through any fault of their own or malfeasance. It's a USB, Judge. We've had hurricanes, we've had storms, we've had -- the DA's Office has been flooded at least once at this point. We don't know that there's information on that.

And so then if it is admitted into evidence, and then some other version is published to the jury, using a file on the DA's laptop, we're publishing things that aren't even in evidence. And there's no way for me to know that it's in evidence or not in evidence until it's opened and displayed.

13

So for those reasons, we're objecting to the introduction at this point of State's 101.

THE COURT:

Mr. Robinson?

MR. ROBINSON:

As it relates to his objection to foundation, she did testify, not just that she placed the USB device in evidence, but she testified that she placed the data that's on the USB, which is what he's objecting to. She's the one who took the data and put it on the USB before placing the USB in evidence. And so she has laid a foundation for the data itself, beyond just simply the storage device.

And so we feel that we have made that record. I -- I feel that's pretty clear, Judge.

. . . .

MR. MONROE:

. . . .

As to the foundation issue, Your Honor, this witness is not capable of laying the found -- I'm not arguing that Ms. Maher did not receive something purportedly from Google or NCMEC and then placed that data on this USB. Certainly.

Ms. Maher may have even formatted this into the two separate versions that are alleged, which of those two, I don't know, the Court doesn't know, I don't know that Mr. Robinson knows which one's on the USB. We have no way to know that.

So the State wants you to grant them permission to introduce whatever they want and there's no -- the problem is, Judge, there's no way to take it back. Like my -- my objection is not that I don't think the State can eventually get their way to proving that the only thing on this is a -- the PDF-generated version of what was on this phone.

The hearsay objection is separate from that Judge. The hearsay objection is I don't think that this witness is capable of discussing the contents of this. There was

14

another party that the State should have subpoenaed and brought in to discuss that.

As to this witness and the foundation and authentication of the documents on this USB without the Court looking at it, without the Court seeing what is on the USB before it has been admitted, there is no way that the Court can admit this. It would be like the State saying, Judge we have a photo here, this piece of paper that has as photo on it. We'd like to -- we'd like to ask the witness a question about it. Ma'am, did you take a photo? Yes. Was that photo sent to us? Yes. Judge, this is that photo. I'd like to submit it, without giving it to the detective letting her look at the photograph, and saying yes, this is in fact the document -- or the photograph that I took and I printed and I sent to your office.

I just -- I don't see how we can skip all of those steps that are required for every other kind of evidence just because this is a USB.

THE COURT:

Did you not ask of the witness, Mr. Robinson whether or not she was familiar with exactly what you've asked her to identify?

MR. ROBINSON:

I believe I did ask her, yes, sir. And she identified that she placed the data on that USB.

THE COURT:

And she certified -- or she verified that that was accurate?

MR. ROBINSON:

That's -- that's my recollection. Yes, sir. That was the purpose of asking those questions. Yes, sir.

THE COURT:

Objection is overruled. I'm satisfied that the requirements have been met that allow this matter to be taken into evidence at this time.

15

Mr. Monroe, I -- I'm very aware of the prior situation that we had in this very courtroom that was a similar situation that you're concerned about. And I agree, that is very concerning. And I believe that the State has -- has laid the foundation to allow this to be put in.

Now obviously, if they -- you are correct that they have something else on here that may not be appropriate, based on what has been presented so far, they proceed at their own peril. Now what is going to be shown to the jury is -- we'll see. If in fact it -- they show something that shouldn't have been shown, well then, we'll have to address that later. And that's a -- would be -- that's how we'll deal with it.

As the foregoing shows, Defendant made several arguments in district court: that the State should have produced a witness from Google to describe how the information at issue was collected, that the State should have shown the files on the USB before admitting the drive, that the USB could have been blank and potentially the State could later publish from its laptop some other version of a document purportedly on the USB, that Maher could have formatted multiple versions of the pertinent documents without anyone being sure what version was actually on the USB, and that the district court should have viewed the documents on the USB before admitting it.[1]

On appeal, Defendant argues that since the files were originally provided by Google, an employee of that company should have been called to testify regarding authentication and chain of custody, specifically how the pertinent information was collected and provided to law enforcement. Further, Defendant asserts on appeal that a Google employee could have described the system's processes and accuracy.

---

[1] Defendant expressed concern that admitting the USB into evidence would automatically result in the USB's contents also being admitted. This view was apparently based on a 2021 writ ruling from this Court, which indicated that admission of the victim's phone included a video the phone contained. *State v. Vice*, 21-619 (La.App. 3 Cir. 9/23/21) (unpublished opinion). *See also State v. Vice*, 22-512 (La.App. 3 Cir. 4/19/23), 365 So.3d 155, *writ denied*, 23-669 (La. 11/21/23), 373 So.3d 457.

Defendant also argues "proper authentication required that the person whose equipment recorded the data on the USB be called as a witness to authenticate the evidence and establish a chain of custody."[2]

Thus, much of the set of arguments made on appeal differs from those made in the district court. New arguments that were not raised in the district court may not be raised on appeal. Uniform Rules—Courts of Appeal, Rule 1–3; *State v. Revish*, 19-1732 (La. 10/20/20), 340 So.3d 864; *State v. Perkins*, 07-423 (La.App. 3 Cir. 10/31/07), 968 So.2d 1178, *writ denied*, 07-2408 (La. 5/9/08), 980 So.2d 688. However, one argument remains viable for review, as it was raised below: that the State should have produced a witness to describe Google's process for collecting the information at issue.

The State cites an unpublished school records case, "*State ex rel. A.H.*, 2018-0387 (La.App. 1 Cir. 09/28/18); 2018 La. App. Unpub. LEXIS 352," noting that in that case a parole officer's testimony provided support for authentication of school records that he had requested and personally retrieved from the school. The case does not appear in the Westlaw database, but another apparent incarnation of that case does:

> In the sole assignment of error, A.H. notes that at the hearing his counsel objected to the introduction of his school report on the basis of hearsay. He notes that the report was introduced through the testimony of the probation officer, who stated that he retrieved the document from a school counselor. Citing La. C.E. art. 803(6), the business records exception to the rule against hearsay, A.H. argues that since the custodian of the report did not testify as to how the records were kept, the report was unauthenticated hearsay and therefore inadmissible.
>
> . . . .

---

[2] In context, Defendant likely had a Google employee in mind, but strictly speaking, the quoted language describes Maher, who downloaded the data onto the USB.

> In addition to the hearsay argument, A.H. herein further contends that the document was not authenticated. . . . One acceptable method of authenticating a public record is through the testimony of a witness with knowledge that the record is what it is claimed to be. La. C.E. art. 901(B)(1). In the instant case, A.H.'s assigned parole supervisor, Gerard Landry, testified as to the authenticity of the school records at issue. According to Landry, A.H. had been booked into the East Baton Rouge Parish Prison on charges of unauthorized use of a motor vehicle, aggravated criminal damage to property, and resisting an officer. Landry further testified that A.H. initially attended Scotlandville High School, but was expelled due to a gang fight and was attending school at EBR Readiness Superintendent Academy at the time of the hearing. Landry obtained A.H.'s school records as a part of his routine duties as a parole officer. He testified that he submitted a record request to EBR Readiness to receive new records. Thereafter, Landry personally went to EBR Readiness and the school guidance counselor, in fulfillment of the request, personally gave Landry the printout of A.H.'s school attendance, report cards, and any other requested information. Accordingly, the report at issue was sufficiently authenticated. We find no abuse of discretion in the juvenile court's admission of the school documentation in this case.

*State in the Interest of A.H.*, 18-388, p. 3 (La.App. 1 Cir. 11/27/18) (unpublished opinion) (2018 WL 6177431).[3] The State gives the same general description of *A.H.* in its brief. The State's point appears to be that a witness from the school did not need to testify in *A.H.*, so a witness was not needed in the present case. However, the two cases are not genuinely analogous. *A.H.* is distinguishable from the present case, since the officer in *A.H.* went to a school and physically obtained the records at issue. The agent in the instant case did not physically visit Google or obtain tangible records. The agent in the current case obtained data via an internet portal.

---

[3] The third footnote of this case (docket number 18-388) noted that the defendant had other pending appeals, including the one cited by the State (docket number 18-387), that alleged the same authentication error. The latter appeal is available on the First Circuit's website. In docket 18-387, the first circuit noted that "under the Code of Evidence, school records are admissible under the traditional public documents exception to the rule against hearsay rather than the business records exception" citing La.Code Evid. art. 803(8). *State in re A.H.*, 18-387, p. 7 (La.App 1 Cir. 9/28/18) (unpublished opinion). The court continued, "The public documents exception to the rule against hearsay is historically based upon the principles of necessity and the probability of trustworthiness. . . . The exception is founded primarily upon the presumption that an individual entrusted with a duty will do his duty and make a correct statement." *Id.*

The officer in *A.H.* could testify that the school records were in fact school records because he picked them up at a school.

The State also cites *State v. Smith*, 04-800 (La.App. 1 Cir. 12/17/04), 897 So.2d 710, but only to contrast it with the present case, as the attempted authentication in *Smith* was not supported by a witness with pertinent personal knowledge.

We have not found any cases on point, but note some analogous federal jurisprudence:

> Generally, evidence is admissible as long as it is (1) relevant and (2) not otherwise prohibited by the United States Constitution, a federal statute, the Federal Rules of Evidence, or any other rules prescribed by the Supreme Court. See Fed. R. Evid. 402.

> ### A. Admitting the Criminal Case File for Non-Hearsay Purposes

> The Government seeks to admit the Criminal Case File for non-hearsay purposes, claiming that a number of records are relevant "both as verbal acts with legal significance" regarding the Russian Treasury Fraud and "because they contain numerous telltale errors and irregularities that indicate fraud and corruption." (Mot. at 8.) To prevail on its request, the Government must satisfy the threshold requirement of authentication, which requires "evidence sufficient to support a finding that the item is what the proponent claims it is." Fed.R. Evid. 901(a); see also United States v. Maldonado-Rivera, 922 F.2d 934, 957 (2d Cir. 1990) ("In general, a document may not be admitted into evidence unless it is shown to be genuine."). This requirement, however, is not "a particularly high hurdle and is satisfied if sufficient proof has been introduced so that a reasonable juror could find in favor of authenticity or identification." Crawford v. Tribeca Lending Corp., 815 F.3d 121, 126 (2d Cir. 2016) (internal quotations and citation omitted).

> The Government can authenticate the Criminal Case File for non-hearsay purposes through the videotaped deposition testimony of Mr. Gorokhov who, among other things, will describe the circumstances by which he accessed and copied the Criminal Case File onto SD cards. (Mot. at 7). A Department of Homeland Security agent will also testify that the hard drive used at trial contains accurate copies of the SD cards and their content. (Mot at 7.) The testimony of these two qualified witnesses is sufficient to meet the requirements of Rule 901. See United States v. Vayner, 769 F.3d 125, 130 (2d Cir. 2014)

19

("The simplest (and likely most common) form of authentication is through the testimony of a witness with knowledge that a matter is what it is claimed to be.") (internal quotations citation omitted). Accordingly, the Government's motion to admit Criminal Case File on non-hearsay grounds is granted.

*United States v. Prevezon Holdings, Ltd.*, 319 F.R.D. 459, 462–63 (S.D.N.Y. 2017)

(footnote omitted).[4]

Another federal court stated:

The district court also did not abuse its discretion by admitting the thumb drive. Corley objected to its admission because (he asserts) it was not authenticated. Under Federal Rule of Evidence 901(a), an item of evidence must "be 'authenticated' through introduction of evidence sufficient to warrant a finding that the item is what the proponent says it is." *Crawford v. Tribeca Lending Corp.*, 815 F.3d 121, 126 (2d Cir. 2016) (quoting Fed. R. Evid. 901(a)). Corley argues that the Government failed to prove that the thumb drive removed from his pocket by Detective Mark Woods was the same thumb drive as that analyzed by the FBI and introduced at trial. But Detective Woods identified the drive as the one that he seized from Corley's pocket. Special Agent John Robertson also identified the drive as the one on which he conducted a forensic analysis. Absent any evidence to the contrary, the district court was entitled to conclude that the thumb drive analyzed by Special Agent Robertson was more likely than not the one seized by Detective Woods. *See United States v. Gelzer*, 50 F.3d 1133, 1141 (2d Cir. 1995).

*United States v. Corley*, 679 F. Appx 1, 4 (2d Cir. 2017) (unpublished summary order), *cert denied*, 583 U.S. 879,138 S.Ct. 205 (2017).

After review, it appears the current record does not contain an actual ruling on the authenticity of the materials contained on the USB. The admissibility of the USB was the issue the district court ruled on. However, the district court left open the option for Defendant to challenge the admissibility of individual documents contained on the USB as they were presented to the jury during the course of trial.

---

[4] "[Louisiana Code of Evidence Article] 901 tracks Rule 901 of the Federal Rules of Evidence." *State v. Taylor*, 04-90, p.10 (La.App. 5 Cir. 5/26/04), 875 So.2d 962, 969, *writ denied*, 04-1649 (La. 11/19/04), 888 So.2d 193.

20

As the State observes in its brief, Defendant did not do so. Louisiana Code of Criminal Procedure Article 841 states: "An irregularity of error cannot be availed of after verdict unless it was objected to at the time of occurrence." In addition, the supreme court has stated: "[A]s a general rule, counsel's failure to obtain a ruling on the merits would constitute an abandonment of the motion." *State v. Walton*, 06-2553, p. 1 (La. 6/1/07), 957 So.2d 133, 134. Therefore, Defendant's arguments were effectively waived in district court. Based on this discussion, the assignment lacks merit.

Also, the State notes in brief that when the documents at issue were introduced, they contained indications that they were authentic, as many of them involved the use of email addresses containing Defendant's name, i.e., "travisshaneryan8869@gmail.com" and "travisshaneryan@gmail.com".

The following colloquy occurred with Ms. Maher at trial after the previously recited objection discussion:

THE BAILIFF:

Please be seated. Court will return to order.

THE COURT:

All right. Ladies and Gentlemen of the Jury, thank you for your patience. When we left the courtroom, Mr. - - I think the last thing that was done was Mr. Robinson on behalf of the State was offering S-101 into evidence.

MR. MONROE:

Your Honor, at this point Defense would object to the introduction of State's 101.

THE COURT:

Ladies and Gentlemen, we've had some discussion regarding that matter. The objection is overruled. I'm going to allow the State to continue at this time.

21

MR. ROBINSON:

Thank you, sir.

THE COURT:

Mr. Robinson.

BY MR. ROBINSON:

Q.     Great.  And I think that S-101 was accepted, so I'll leave it right there for just a moment so that you can access it here in a moment

A.     Okay.

Q.     In receiving the records from Google, did you -- did it contain data about who the account belonged to and the user information?

[Ms. Maher]:     It contained the user information; yes.

Q.     Great.  And if I showed you a printed copy of that same information, would you be able to identify that for us?

A.     Yes.

. . . .

BY MR. ROBINSON:

Q.     Ms. Maher, do you recognize the packet of documents I've handed you marked as S-101-A in globo?

A.     I do.

Q.     Great. And what is it?

A.     This is part of the Google search warrant return that has the subscriber information and the IP logins.

Q.     And is this a paper copy of the same data you testified to earlier?

A.     Yes.

Q.     Great.

MR. ROBINSON:

In connection with that information testimony, I would offer S-101-

. . . .

THE COURT:

Mr. Monroe, Ms. Traub?

MS. TRAUB:

No objection, Your Honor.

THE COURT:

Without objection. All right.

BY MR. ROBINSON:

Q.    And if I -- have you reviewed for your testimony today a copy of some email exchanges, a printed copy is S-101-B?

A.    I'm sorry, can you repeat the question?

Q.    Yes, ma'am.  Do you recall -- let me ask you this.  Did you find some email exchanges of note with a video attachment to the email?

A.    Yes, sir.

Q.    And if I showed you a paper copy of that same email exchange, would you be able to recognize it?

A.    Yes, sir.

Q.    Great.

[Mr. Robinson approached with S-101-B]

. . . .

BY MR. ROBINSON:

Q.    Do you recognize S-101-B?

A.    Yes.

Q.    What is that information?

A.    This is email exchanges between an Emma Spiller and -- from Emma Spiller sent to travisshaneryan@gmail.com.

Q.    And the documents I've handed you, are those copies of what you've testified to as received from Google?

A.    Yes, sir.

Q.    Great.

MR. ROBINSON:

        In connection with that testimony, I'd offer S-101-B.

(Exhibit S-101-B marked for identification.)

THE COURT:

        Ms. Traub, Mr. Monroe?

MS. TRAUB:

        No objection.

THE COURT:

        Without objection.  All right.

MR. ROBINSON:

        Thank you.

BY MR. ROBINSON:

Q.    And then lastly, did you find any Google chats of note in your investigation?

A.    I did.

Q.    And if I showed you a printout copy of those Google chats that y'all identified as significant, would you be able to recognize that?

A.    Yes.

Q.    Thank you.

[Mr. Robinson approached with S-101-C]

24

. . . .

BY MR. ROBINSON:

Q.    Ms. Maher, I've handed you S-101-C.  Do you recognize the documents in that packet that I've handed you?

A.    Yes.

Q.    And what do you recognize that packet of information to contain?

A.    These are Google chats between travisshaneryan@gmail.com and different users or logos.  L-O-Z-B-U-R-N-S-X-X-X @gmail.com.

Q.    Great.  And the information I've handed you in S-101-C, is that the information that was received from Google that we offered as S-101?

A.    Yes.

MR. ROBINSON:

        In connection with that testimony, I would offer, file, and introduce that into evidence.

        (Exhibit S-101-C marked for identification.)

MS. TRAUB:

        No objection, Your Honor.

THE COURT:

        Without objection.  All right.

MR. ROBINSON:

        Thank you kindly.

        And so first, if I may, I'll move to publish S-101-

        . . . .

BY MR. ROBINSON:

Q.    All right.  Ms. Maher, so I've got published here S-101-

25

[Q]. Can you walk the jurors through what it is that we're looking at.

A. So this is the Google subscriber information. So when you create your Google account, this is information that's put in: The name is listed as Shane Ryan; the email address is listed as travisshaneryan@gmail.com; the status at the time that I issued the search warrant for the account is disabled, meaning it's no longer an active account; the end of service date is next; the services used, so you have Gmail, Google calendar, hangouts, payments, and so on; the recovery email -- I'm sorry, the recovery email address of travisshaneryan8896 -- or 69 I'm sorry, @Gmail.com; the creation date of 5/14/2018 the terms of service IP address, which would be the -- when he agreed to the terms and services; language code would be English; the phone number related to the account; the Google account ID; and then the last logins.

. . . .

Q. And what did the recovery email here signify to you in this investigation?

A. That it was similar to the same email address.

Q. Great.

MR. ROBINSON:

   If I may have just a moment, I'll publish S-101-B.

. . . .

A. That is to travisshaneryan@gmail.com.

Q. And then his response, can you just read 'em -- read 'em throughout and indicate who's sending what, please?

A. From travisshaneryan@gmail.com . . . .

   From the other user, "Show me a pic of a young girl you into."

   Travis Shane Ryan, "Okay."

Q. And then what do we have there?

A. An image of a juvenile female on a rope swing.

Q. Have you met that juvenile female?

26

A.    I have.

Q.    Where did you meet her?

A.    At her mother's house, which would be Mr. Ryan's brother's wife.

Q.    And if you would, just continue reading the messages, please.

A.    From the other user, "How do you know her?"

      Travisshaneryan@gmail.com, "I don't think we will discuss that yet. She is my brother's wife."

Q.    Can you read that last word one more time[?]

A.    "Brother's wife's."

Q.    And then next, continue on, please.

A.    That is an image of a bedroom, sent by travisshaneryan@gmail.com.

      . . . .

A.    Okay.

Q.    And just for the record, can you verify what it is that you're looking at here?

A.    A male's penis.

Q.    Great.  And then the next photograph appears to be what?

A.    An image of Mr. Ryan.

Q.    And who is it sent from?

A.    From travisshaneryan@gmail.com.

Q.    And what is the date it's sent?

A.    12/4 of '18.

Q.    And then the next?

A.    An image of Mr. Ryan.

Q     Sent from which account?

A. Travisshaneryan@gmail.com

After review, we find any admissibility errors are harmless. *Cf. State v. Fontenot*, 23-175 (La.App. 3 Cir. 10/25/23) (unpublished opinion) (2023 WL 7009290); *see also State v. Kennerson*, 96-1518 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367. The foregoing record evidence shows that even if an error occurred in the district court's initial ruling, it was harmless. The record contains enough information to conclude the documents at issue were authentic. *Cf. United States v. Perez*, 61 F.4th 623 (8th Cir. 2023).

Defendant also argues that the State did not establish a proper chain of custody for the USB. "[A]ny defect in the chain of custody goes to the weight of the evidence, not its admissibility." *State v. Celestine*, 11-1403, p. 8 (La.App. 3 Cir. 5/30/12), 91 So.3d 573, 579. Thus, for the reasons discussed, this assignment lacks merit.

**ASSIGNMENT OF ERROR NO. 2:**

In his second and final assignment of error, Defendant argues that his trial counsel was ineffective in failing to file a motion to quash the jury venire. He acknowledges that such claims are normally raised in the post-conviction relief process but observes they can be addressed on appeal when the record contains enough information to support an analysis. *State v. Trosclair*, 19-833 (La.App. 3 Cir. 6/24/20), 299 So.3d 704, *writ denied*, 20-949 (La. 1/20/21), 308 So.3d 1162. Defendant argues that the jury venire was defective because the jury summons improperly indicated that persons with felony convictions could not serve on a jury, making the summonses "illegally restrictive." However, instead of raising the issue in a motion to quash, trial counsel raised the issue after the verdict, in a motion for new trial.

28

This court has previously discussed the core analysis for ineffective assistance of counsel claims:

> The right of a defendant in a criminal proceeding to the effective assistance of counsel is constitutionally mandated by the Sixth Amendment of the U.S. Constitution. In order to prove that counsel was ineffective, the defendant must meet the two-pronged test enunciated by the Supreme Court. First, the defendant must show that counsel's performance was deficient. Second, the defendant must show that this deficiency prejudiced the outcome of the trial. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Brooks*, 505 So.2d 714 (La.1987), *cert. denied*, 484 U.S. 947, 108 S.Ct. 337, 98 L.Ed.2d 363 (1987). To establish a claim of ineffective assistance of counsel, a defendant must demonstrate that his defense attorney failed to meet the level of competency normally demanded of attorneys in criminal cases. *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Fickes*, 497 So.2d 392 (La.App. 3 Cir.1986), *writ denied*, 515 So.2d 1105 (La.1987).

*State v. James*, 95-962, pp. 4–5 (La.App. 3 Cir. 2/14/96), 670 So.2d 461, 465.

The venire defect at issue stems from the 2021 amendment of La.Code Crim.P. art. 401, which changed the law and made some convicted felons eligible for jury duty. At the time the parties selected the jury for the present case, the law had taken effect, but the Calcasieu Parish Clerk of Court had not modified the language in its jury summonses accordingly. Specifically, the jury summonses allegedly sent out included a statement that in order to qualify as an eligible juror you must "not be under indictment for a felony nor have been convicted of a felony for which you have not be [sic] pardoned." In brief, Defendant asserts that his jury venire was "improperly drawn and not representative of a fair cross-section of the community." Defendant further asserts that, if it were not for counsel's error in failing to file a motion to quash, Defendant "would have been judged by a jury of his peers."

The district court held a hearing on the motion for new trial and addressed the merits, stating:

THE COURT:

Okay. Thank you.

I -- I don't disagree that this could have been resolved with a timely Motion to Quash, obviously. But then, you know, Mr. Monroe made a statement to where if that would have been brought up timely, I probably would have had pause to say, you know what? Unless Mr. Ryan, with his attorneys, say, Judge, we want to put this off or -- he might have said, look, I want to go to trial. I want to get this over with.

MR. ROBINSON:

Uh-huh.

THE COURT:

So it doesn't necessarily mean that it would not have gone to trial. That would have been a decision, I think, for the defendant to make at that time.

But I want to rule on the Motion for New Trial, because I think that needs to be addressed here.

Based on what I've heard here, the Motion for New Trial based on the suggested defect that Mr. Monroe points out here is not a significant error in the process. I -- I just don't find that that would have kept Mr. Ryan from having a -- a good jury. The prejudicial defect, if you will, was miniscule.

Again, for several other reasons. One is, I know for a fact that the Clerk's Office would never tell someone not to appear because I don't believe I qualify, possibly because I'm a convicted felon. I don't think that would have happened.

Because I know for a fact that the Clerk's Office says, take that up with the Judge.

We have the jury -- jury mark system that refers all of those requests for excusal directly to the Judges.

Finally, I know for a fact in my trials, you know exactly where I'm going with this, every juror I ask, do you meet the qualifications that would allow you to serve as a juror in this trial? Reside in Calcasieu Parish, resident of Louisiana, read, write, and speak the English language, not under conviction for what you haven't been pardoned.

In one of our very trials, and you know which one I'm talking about here, not -- a trial shortly after that –

MR. MONROE:

Uh-huh.

THE COURT:

-- there was someone on the jury venire that said, Judge, hold on. I'm a convicted felon. And I'll be honest here, I said, oh, you can't serve. And I don't remember if it was you, Charles, Conrad, Mr. Monroe, or Liz said, Judge, hold on. You have to ask them how long it's been. And I was corrected. And it -- so I know we clarify [sic] that before.

So that means I've never kept anybody off of any one of my juries. And that's not to say that I believe any other Judge has done it. But I know that that's, again, a normal procedure in this court.

So all said and done, I do not believe that the misstatement in the Clerk's summons reflects that there's been any significant error in the process. It has been corrected. I don't think it's such a prejudicial defect that it merits a new trial in this matter.

Motion for New Trial denied.

MR. MONROE:

Thank you, Your Honor. If you'll note our objection to the issue for the record.

Though both briefs discuss this assignment of error at some length, a lengthy analysis is not necessary. Defendant does not meet the second prong of *Strickland*, as he does not demonstrate that the deficiency of his counsel caused prejudice, that it "deprive[d] [him] of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. First, although Defendant raised the issue in a motion for new trial rather than a motion to quash, the district court did not treat this discrepancy as a

31

barrier to review on the merits. [5]    Second, Defendant's argument does not demonstrate any defects in the ruling.  The court provided several practical points to show that Defendant was not prejudiced by the Clerk of Court's mistake, but Defendant does not address why any of these points were wrong.  Defendant merely quotes a news article that contended diverse juries, including those with former felons, tend to be highly deliberative.

For the reasons discussed, this assignment lacks merit.  Further, the overall analysis in this opinion supports the affirmation of the convictions and sentences.

**DECREE:**

Defendant's convictions and sentences are affirmed.  However, the district court is instructed to correct both the minutes of sentencing and the Uniform Sentencing Commitment Order to correctly reflect that Defendant's sentence for possession of methamphetamine, count seven, was not imposed without benefit of parole.

**AFFIRMED WITH INSTRUCTIONS.**

This opinion is NOT DESIGNATED FOR PUBLICATION.
Uniform Rules—Courts of Appeal, Rule 2–16.3.

---

[5] Defendant notes another case that arose out of Calcasieu Parish, *State v. Lewis*, 23-616 (La.App. 3 Cir. 4/17/24), 387 So.3d 747, *writ denied*, 24-643 (La. 12/11/24), 396 So.3d 970, in which Defendant's failure to challenge the venire in a motion to quash precluded review on the merits.